## JONES v. TEXAS & P. RY. CO.
### No. 1327.

Court of Appeal of Louisiana. First Circuit.
May 8, 1934.

Dubuisson & Dubuisson, of Opelousas, for appellant.

Peterman, Dear & Peterman, of Alexandria, for appellee.

LE BLANC, Judge.

On January 4, 1933, just a minute or two before midnight, plaintiff's husband, Hebert Hoskins Hill, drove his Ford automobile into a box car of the Texas & Pacific Railway Company on Landry street in the city of Opelousas. The train of which the box car formed a part had just started to move forward slowly, and the automobile was dragged a few feet across the street. Either the impact itself or the dragging of the automobile caused the latter to catch fire, and, as a result, a woman who was a guest passenger with Hill died before she could be rescued from the flames, and Hill himself, although taken out alive, was so severely injured that he died early the following morning at St. Rita's Hospital in Opelousas.

Mrs. Hill has instituted this suit against the defendant railroad company for damages for the death of her husband, claiming $25,267.82 for herself and $25,000 on behalf of her minor son, Hebert Hoskins Hill, Jr.

In her petition she charges negligence against the defendant in three particulars: (1) In letting one of its trains obstruct a street crossing for a longer period of time than was permitted by municipal ordinance of the city of Opelousas; (2) in permitting its train to remain on a grade crossing that was peculiarly dangerous to automobile traffic at night, in that the lights of the car passed underneath the box cars or coaches, and this to the knowledge of the railroad company, as a similar accident had happened a few months before at this same place; and (3) in having violated an ordinance of the city of Opelousas which required it either to install at the crossing a signaling device or else maintain a flagman to warn the public of the presence of its trains on the tracks. Whilst a specific violation of section 1 of Act No. 12 of 1924, which requires the ringing of the bell and the blowing of the whistle by a train approaching a crossing, is not charged in the petition, there is nevertheless an allegation from which the same may be implied.

The defendant for answer denied all charges of negligence and pleaded that the fatal injury sustained by the decedent was due either wholly to his fault or negligence, or that he materially contributed thereto, and

in consequence thereof there is no liability on its part. Counsel for plaintiff contend that, if defendant meant to plead contributory negligence on the part of the decedent, the plea as made in its answer is insufficient for lack of specific allegations. Of course the character or insufficiency of the plea will only have to be inquired into should it be held that the defendant was negligent on any of the grounds set out in plaintiff's petition.

There was judgment below in favor of the defendant dismissing the plaintiff's suit at her costs. The trial judge assigned no written reasons for judgment, and we therefore are not informed as to whether he held the defendant free of negligence or found that the decedent had been guilty of contributory negligence. From the judgment rendered, the plaintiff took this appeal.

The decedent was a young man engaged in the sawmill business, having been yard foreman for the Turner-Farber Lumber Company at Lemoyen, La. On the afternoon of January 4, 1933, he drove to Opelousas, taking with him the lumber company's negro cook who was to buy some groceries and later wait for him to pick her up at a small store not far from the railroad crossing where the accident took place, for their return to Lemoyen. The negro woman, whose name is Lena Patterson, says that it was about 8 o'clock when they got to Opelousas. From that hour until 11:55 no one testified as to the movements of Mr. Hill, but shortly before the time mentioned he drove in front of, and stopped at, the De Luxe Restaurant, where he spoke to Mr. Howard De Jean. He and the woman who was with him were both seated on the front seat of the automobile. De Jean sat in the back and had a cup of coffee with them. They stayed there about ten minutes when De Jean got out of the car and they drove off. The next he heard of them was when the accident happened not more than three minutes afterwards.

█ It is shown by the testimony of the conductor and others of the crew that the train, which was a mixed train running between Crowley and Melville, arrived at Opelousas at 11:55 that night. It is also shown that the accident happened about 11:58, just as the train had been put in motion. It is apparent therefore that the box car which the automobile ran into had not occupied the crossing for a longer period of time than three minutes, if that long, and the first question to determine under the issue raised by counsel for plaintiff is whether it is negligence on the part of a railroad train to permit one of its cars or coaches to obstruct a crossing for three minutes. In her petition plaintiff alleges that such obstruction was for a longer period than permitted by municipal ordinance of the city of Opelousas adopted June 3, 1890, but, as far as the record discloses, no such ordinance was offered or produced in evidence, and we are therefore unable to say whether or not there was a violation, assuming that such ordinance is any longer in existence. Other than this, we have been referred to and know of no law, rule, or regulation which would justify a finding of fault or negligence on the part of a railroad for permitting its trains to remain on a crossing for not more than three minutes. It may very well be that there are regulations or city ordinances, which require trains to open up a crossing after a certain period of time so as not to unduly delay traffic on the street or highway, but these would have no connection with the issue of negligence that is here raised by the plaintiff.

█ To sustain her second charge of negligence against the defendant company, that is, that the crossing was peculiarly dangerous to automobile traffic at night, and this to its knowledge, plaintiff, in order to show knowledge, must rely on the testimony of witnesses who claim to have had experiences similar to that of her husband, except that they were more fortunate, in that the accidents they were in did not result fatally. Strenuous objection was made to the offer of such testimony on the ground that it was res inter alios acta. The trial judge ruled that it was inadmissible, but permitted it to go in the record for the benefit of the appellate court. There seems to be considerable conflict in the jurisprudence on the question of the admissibility of testimony of prior accidents or injuries under circumstances similar to those which are being inquired into, but the weight of authority appears to be in favor of its relevancy for the purpose of showing the dangerous character of the locus and of proving knowledge of the danger on the part of the agency under whose control it is. In treating the subject especially with regard to railroad crossing accidents, it is stated in 52 C. J. page 415, § 1993: "Proof of other accidents or near accidents at the same crossing at other times under the same or similar circumstances may be admitted for the purpose of showing the existence of the dangerous conditions at the crossing, and knowledge thereof on the part of the defendant." Ruling Case Law, in treating the same question under the sub-

jects of Railroads, vol. 22, page 1055, of Evidence, vol. 10, page 942, and of Negligence, vol. 20, page 178, refers to the conflict of authority, but, in discussing the matter under the topic of Negligence in the last-mentioned volume, the following conclusion is reached: "While there is authority to the contrary, the decided weight of authority holds that it is permissible to prove the occurrence of other injuries under substantially the same conditions; for the fact that other injuries have occurred tends to prove knowledge of the danger, and this, as appears elsewhere is the fundamental of negligence."

■ Accepting this last statement, however, as a correct pronouncement of the law on the subject, the testimony of prior accidents submitted by the plaintiff in this case has served her but little, if any, purpose at all. If, as appears from the quotation, the evidence was admissible primarily for the fact that it tended to show knowledge, which is said to be the fundamental of negligence, on the part of the defendant, it has fallen short of the proof intended, because it is shown that in not one of the accidents about which the witnesses testified was a claim presented against the defendant, nor was the matter in any way brought to its attention. Plaintiff's only hope therefore lies in whatever value that testimony, such being its purport, may have in supporting the contention that the crossing was dangerous because the rise of the grade above the level of the highway caused the lights of an approaching automobile to pass under the box car which was standing motionless on the crossing and the driver was unable to see the car itself.

■ Counsel for plaintiff invoke the rule as laid down in the case of Elliott v. Missouri Pacific Railroad Co. (Mo. App.) 52 S.W.(2d) 448, 451, that, "where a railroad crossing is, on account of surrounding circumstances or conditions, especially dangerous, the company must exercise care commensurate with the danger." Contending for a strict application of that rule, counsel say that it was the duty of this defendant either to guard the crossing by having a flagman stationed there, or else not permit its train to remain motionless thereon. The first point to determine then is whether the crossing, on account of surrounding circumstances or conditions, was really a dangerous crossing.

In her petition, plaintiff alleges that it was "because of the sharp rise of the grade of the railroad bed six or eight feet above the level of the paved highway," that "the lights of her husband's automobile passed under the

cars or coaches of said train and accordingly failed to reveal its presence. * * *" The testimony, however, is that the rise in the grade is only two and one-half feet above the level of the street, and, from the photographs offered in evidence, we would judge that it is very gradual. It is also shown by testimony that is not disputed that the distance from the bottom of the car, or a car of the same series as that which was parked on the crossing on the night of the accident, to the top of the rail, is two feet, three inches. The car itself measures forty-one feet in length and eleven feet from the bottom sill to the top of the roof. Such being the situation, we believe that the laws of physics would disprove counsel's theory that the lights of an approaching car would pass underneath the box car stationed on the crossing, and would demonstrate rather that some of the rays, if the lights are properly projected, would have to strike an object of such proportions long before it was too late to avoid running into it. As a matter of fact, the result of certain tests made by witnesses for the defendant under conditions similar to those existing on the night of the Hill accident showed that the box car was visible at a distance of three hundred and fifty feet with the driving lights turned on and a distance of one hundred and thirty feet with the dimmer lights burning on their cars.

It is shown, besides, that Landry street is so well illuminated at night that it is called the "White Way" of Opelousas. This illumination consists of a series of lights set one alternately about one hundred feet apart on each side of the street and at an elevation of twelve feet, and the one nearest the crossing on the east side, that is, the side from which the decedent approached it, being about ninety-eight feet distant. There is one much nearer on the west side of the track, but, because of its location behind a post, it is doubtful that it served to illuminate the street at that particular spot. These lights were all turned on at the time of the accident, and, in our opinion, were bound to have, in some degree, illuminated that crossing.

As against the testimony of the three witnesses who testified about having been in accidents or near accidents and on which plaintiff relies to prove the dangerous character of the crossing, we have the physical facts and conditions we have related, plus the testimony of the two witnesses who made the actual tests referred to, from all of which we have concluded that the situation was not one which required extraordinary care on

the part of the defendant, and that it had complied with the necessary requirements when its brakeman had flagged the crossing as the train approached it.

Counsel for plaintiff contend that the flagging of the crossing for the approach of the train only was not a compliance with the ordinance of the city of Opelousas, and that a strict compliance therewith contemplated that the flagman should have protected the crossing during the time the train remained standing on it. We think that the conclusion we have reached after discussing the second ground of negligence charged by plaintiff disposes of her contention on this point also. However, we wish to add that we would not apply the same construction that counsel contend for to the ordinance. We observe that, whilst its title indicates that it is intended to require railroad trains to have flagmen stationed at certain crossings within the city of Opelousas, "while trains are moving," the body or enacting part simply ordains that railroad companies operating through the said city "shall be required to have a flagman at railroad crossing," without regard as to whether the trains are moving or not. Whether the discrepancy between the title and the body of the ordinance affects its validity or not, we do not feel called on here to decide, as that issue was not raised. As obviously the ordinance could not have contemplated that a railroad company would be required to keep a flagman at the eight crossings named therein, regardless of the presence or absence of a train on the tracks altogether, we take it that the object, as expressed in its title, is the proper purpose of its enactment. In other words, that the railroad companies are required to maintain a flagman at those crossings only when trains are actually moving over them. In this case, as already stated, the requirement had been complied with as it is shown by the testimony, and not contradicted, that one of the brakemen, before the train reached Landry street, had gotten off, gone to the middle of the crossing, and flagged it and only left the crossing to go back to the depot after the train had come to a stop. Referring to interpretation of the term "during the movement of trains" placed by the court in Great Northern Ry. Co. v. U. S. (C. C. A.) 211 F. 309, in construing a statute prohibiting the employment of any one engaged "in the move-ment" of a train for more than a certain number of hours, in which it was held that the term included the time during which the train was stopped, counsel for plaintiff would have us apply the same reasoning in construing the ordinance in this case. We could only do so by analogy, and, as the subject-matter of the statute in that case is so entirely different from the purpose of the ordinance here, we fail to see how we could apply the analogy.

■ This brings us to the last charge of negligence against the defendant, that is, the failure to have had the locomotive bell ringing and the whistle blowing. This charge, as brought out in brief of counsel, implies a violation of section 1 of Act No. 12 of 1924. Referring to that statute we find that it requires every railroad company to have their locomotives equipped with a whistle and bell of certain description, and that it "shall cause the bell to be rung or the whistle to be blown at the distance of at least three hundred yards from the place where the railroad crosses over any highway or municipal street, and the bell shall be kept ringing or the whistle shall be kept blowing continuously until said crossing is passed." Here, the proof is, as already shown, that the locomotive had already passed the crossing some several car lengths and the whole train had been at a complete stop almost three minutes when the accident happened. Even if there had been a violation of the statute, that could not have been the cause of the accident, and, if we were to leave the statute out of consideration, we doubt that it would seriously be contended that a train would have to keep its locomotive bell ringing or whistle blowing for three minutes after it had come to a stop at one of its stations.

We are of the opinion, after a careful consideration of the case, that plaintiff has failed to show negligence on the part of this defendant in any one of the particulars as alleged in her petition, and that it cannot be held liable in any way for the unfortunate lot which has befallen her and her minor child. Having reached this conclusion, it becomes unnecessary to consider in any way the question of contributory negligence which has been injected in the case.

The judgment appealed from is correct, and it is accordingly affirmed.