Ellis Domite, son of the plaintiff, Mrs. Susie Domite, was fatally injured when the delivery truck he was driving collided *Page 56 
with a gondola car of a train of the Missouri Pacific Railroad Company, at the time being backed over a spur track which crosses Louisiana Highway No. 165, near the Village of Woodworth, in Rapides Parish. The deceased was traveling northerly. The accident occurred at the hour of 4:35 A.M., November 20, 1940.
Plaintiff instituted this suit against Guy A. Thompson, trustee of the Railroad Company, in bankruptcy, and C.E. Carnahan, conductor in charge of the train, to recover damages for the pain and suffering of the deceased, the mental pain, suffering, shock and anguish experienced by her because of his sudden and tragic death, and for the loss of support which the decedent provided her and her children. Her right to recover is based upon these allegations, to-wit:
That the crossing at which the accident occurred is extremely dangerous and hazardous to the knowledge of the railroad company, its agents, employees and servants; that because of the heavy traffic over the highway at that particular time and atmospheric conditions (heavy fog) then prevailing, the crossing should have been protected by flagmen or flares to apprise motorists of the presence of the train across the highway; that the failure to take these precautions for the protection and safety of the traveling public constitutes gross negligence and was the sole and proximate cause of the accident.
Defendants' joint answer is a general denial of each and every allegation of fact essential to plaintiff's recovery; and they specifically aver that the accident was in no respect due to any carelessness or negligence on the part of either; that no unusual or extraordinary conditions, atmospheric or otherwise, then existed, which required said agents and train operatives prior to preempting the crossing, to do more than was done for the safety of persons traveling on said highway. In the alternative, they plead that the gross negligence, inattention and carelessness of the deceased in these respects, to-wit, driving his truck at so fast a speed as to prevent him from stopping it within the efficient range of the vision of its headlights, failing to keep and maintain a proper lookout or to efficiently react when the obstruction across the highway came into his vision, were the proximate causes of the collision.
Trial of the case consumed six days and at the conclusion thereof it was taken under advisement by the learned trial judge. Judgment rejecting plaintiff's demand, supported by lengthy written reasons, was rendered several months thereafter. She prosecutes this appeal.
When plaintiff closed her case in chief, defendants' counsel filed motion for and urged the court to render judgment rejecting her demand. This motion was predicated upon the theory that the testimony and evidence adduced in her behalf were insufficient and inadequate to warrant judgment in her favor. Plaintiff countered by moving the court to hold that by not offering any evidence but asking for judgment without doing so, defendants, in effect, rested their part of the case and, therefore, the court should order the case finally closed. In the alternative, plaintiff takes the position that by filing said motion defendants waived the right to adduce testimony in support of their defenses and thereby estopped themselves from doing so. Both motions were properly overruled.
This court in Williams et al. v. Missouri Pacific Railroad Company et al., 6 So.2d 79, on the 28th day of November, 1941, held that a motion by a defendant for judgment rejecting plaintiff's demand at the conclusion of plaintiff's evidence in chief, was an unknown and unauthorized procedure under the laws of this state, and should not be entertained by the court. In that case the trial court sustained the motion and dismissed the suit. On appeal to this court, the judgment was annulled and the case remanded for further proceedings as though the motion had not been filed. The Supreme Court denied application for writ of review with the terse statement "judgment is correct". In that case defendant's counsel relied upon the case of Young v. Thompson, La.App., 189 So. 487, which held that such a motion was permissible; and in view of the defendant's reliance on this decision, we held that he should be allowed to normally rest his side of the case after or without adducing evidence. The case was remanded for further proceedings.
The present case was tried several months before the Williams case was decided by this court, and had the motion in this case been sustained, we would have felt impelled to take the same action as we did in that case; but since the motion was overruled and defendants went forward with their evidence, over plaintiff's objection, *Page 57 
a fortiori should we not hold that by filing and urging the motion they waived the right to thereafter introduce testimony.
The accident alleged upon happened at the same crossing as that involved in Squyres v. Baldwin et al., decided by this court, 181. So. 584, and affirmed by the Supreme Court under writ of review 191 La. 249, 185 So. 14. In that case a heavy snow storm created unusual and extraordinary atmospheric conditions at and about the locus of the crossing whereas a heavy fog is alleged to have done so in the present case.
The spur track branches from the main line near the depot at Woodworth, extends in a southerly direction for a short distance and then curves westerly and crosses the highway at grade and level therewith at an angle of about forty-five degrees. Its western terminus is at the gravel pit of the Alexandria Gravel Company not far from the highway. It is used exclusively to promote the interest and business of that company. Frequency of switching operations depends upon the volume of business of the gravel company. In November, 1940, such operations were made during day and night.
United States Highway No. 165, below and above the locus of the accident, is straight for some distance. Its general course is north and south. The main line of the railroad is nearly parallel thereto. There are no trees, buildings or other view obstructing agencies on either side of the road near the crossing. The customary "Louisiana Law Stop" signs and smaller highway markers are properly located to warn motorists of the presence of the spur track.
The decedent operated a bread truck out of Alexandria over Highway No. 165 to Camp Claiborne, then being constructed. On the morning of the fatal accident he drove to the camp, delivered bread, picked up a boy by the name of Sam Bailey and then started back to Alexandria. He had traveled about four miles when the accident occurred. The truck collided head-on violently with the side of the heavy metal gondola car. Photographs of the truck reveal a vehicle as nearly totally destroyed as any we have seen over a period of many years on the bench. The character of the damage to the truck unquestionably proves that it was moving at a very rapid speed at time of impact. To further support this conclusion, the side and under mechanism of the gondola car were also injured.
Deceased was well acquainted with the physical conditions where the accident occurred and well knew that the spur track was there and that it was regularly used to transport cars across the highway to the gravel pit. Bailey also knew that the track crossed the road there.
The train in question consisted of a locomotive, and at least thirteen empty cars. It was backed from the main line onto and over the spur track to the east side of the highway where, under appropriate signaling by the brakeman to the engineer, it was brought to a stop. The brakeman walked to the center of the highway, looked north and south to satisfy himself concerning traffic conditions, and observing that the road was clear in each direction, flagged the engineer to back up. Before backing across the road the engineer sounded the road crossing signal and the back-up signal, each consisting of several blasts of the whistle. The engineer then climbed upon the rear car. Several cars of the train were backed across the road where contact was had with two other cars. The train was then stopped for a brief time to enable the brakeman to couple these two cars to the train. While this was being done, the accident occurred. The train had been stopped not more than three or four minutes.
Plaintiff contends that the fog which enveloped the area about the crossing was so dense and the traffic over the highway so heavy that this case falls within the court's holding in the Squyres case, supra. It was held in that case, as reflected from the syllabus:
"That motorist and guest were on public highway on a dark night when heavy snow was falling which limited motorist's visibility to 25 feet did not constitute negligence on the part of motorist and guest, as respects guest's right to recover for injuries sustained when automobile collided with train.
* * * * *
"Where railroad, without stationing trainman with visible warning signal at crossing, permitted gravel cars to obstruct crossing on seldom used spur track on dark night during heavy snowstorm, and visibility was so poor as to conceal railroad crossing signs, railroad was liable for injuries to guest in automobile which collided with train, since railroad was guilty *Page 58 
of negligence which proximately caused collision."
As to traffic conditions referred to, this may be said:
There was employed in November, 1940, an army of workmen, estimated at 20,000, at Camp Claiborne. These men worked in three shifts of eight hours each. One shift began work at eight o'clock A.M., one at four o'clock P.M. and the third at midnight. The larger portion of these workmen had living quarters in the City of Alexandria. Within an hour or so prior to and following each shift, the road between Alexandria and the camp would be heavily laden with motor vehicles of various kinds, but after each shift had reached the camp or Alexandria, traffic on the highway became normal. At the time of the accident, traffic on said highway was very light between Alexandria and Woodworth. The ambulance driver and traffic officers who hurried to the scene of the accident met and passed only a few vehicles on the way there. Even though it be conceded that during the rush hours the duty devolved upon the railroad company to employ unusual and extraordinary means to protect the crossing, it does not follow that it was obligated to do so after the rush hours were over.
Concerning the main issue of the case, towit, whether there was a heavy fog at the time and place of the accident, the testimony is extremely conflicting. Some of plaintiff's witnesses say there was a heavy fog, others that it was hazy and misty-like, or a "little fog", while a greater number for defendants are positive that there was no fog at all at the crossing when the accident occurred. Many of defendants' witnesses say that weather conditions at the time were not uncommon for that hour of the morning, a "little hazy", but insufficient to materially interfere with visibility. Some of plaintiff's witnesses who testified that a fog did exist, also say that efficient car headlights would penetrate it from one hundred feet to one hundred fifty feet. The driver of the ambulance from Alexandria to the scene of the accident and the two troopers who followed closely, all testified there was no fog about the locus of the accident nor for several miles north of it. They traveled at a speed in excess of eighty miles per hour, which, they say, could not have been maintained had heavy fog hung over the highway. Two other troopers coming from the south, arrived at the crossing within a few minutes after the collision. They are also positive it was not foggy when they arrived.
The train crew, of whom there were six, all testified that when the accident occurred visibility was good. Some of the crew testified that they saw the lights of the truck, a few hundred feet away, as it approached the crossing. The testimony of the idle occupant of the car, Sam Bailey, as regards atmospheric conditions, the speed of the truck and other pertinent matters, is so unsatisfactory, conflicting and in many respects so unreasonable, that its probative worth is virtually destroyed.
As regards weather conditions in the Alexandria and adjacent areas the morning of November 20, 1940, the lower court summarized the testimony of the local meteorologist as follows: "Dr. Luther Stewart, residing in Alexandria, testified that he has charge of the weather observation tower and instruments at his home and makes reports of weather conditions for the government; that according to his records there was not in existence on the morning of November 20th, 1940, any foggy condition within the area covered by his observation. He states that there is an observation tower some 3 or 4 miles west of Woodworth upon a very high hill at which an observer is stationed to make observation and records of weather conditions; and that there was no mention on those records of the existence of fog on that morning. He states further that if there was such a wide spread and heavy foggy condition as was described by some of the plaintiff's witnesses, the weather observer in the tower west of Woodworth should have made some mention of same in his report."
The trial judge in a painstaking manner epitomed the testimony of each witness concerning atmospheric conditions at and about the crossing when the accident happened and concluded: "Taking the testimony as a whole on the question of weather conditions, the court feels amply warranted in the conclusion that there was not any fog in the vicinity of the scene of the accident at the time of the accident, or at most there was only a slight hazy or light foggy condition."
We find ourselves wholly in accord with this factual finding.
Plaintiff's counsel do not dissent from the rule generally applicable in cases of this character, which is found in 99 *Page 59 
A.L.R. 1455, and is as follows: "In general, in the absence of special statute or ordinance, the presence of a railroad train, or cars, on a crossing, is notice to the driver of a vehicle on the highway, of such obstruction; and if there are no unusual circumstances, the railroad company cannot, it would seem, be found negligent merely because it failed to station guards or light the cars, or otherwise give warning of the presence of the obstruction."
But they argue that the facts of this case bring it within the exception to that general rule also appearing on the same page of that work, to-wit: "However, the railroad company's duty is not necessarily discharged under all circumstances if it fails to give warning in some form of the presence of the obstruction. The atmospheric conditions, obscurity, and darkness of the crossing, the length of time it is obstructed, and the nature of the highway, may require that warning be given if the company is to be found in the exercise of due care. The recent decisions support these general propositions."
The general rule quoted above was followed in the following Louisiana cases, towit: Sweeney v. Missouri Pacific Railroad Company, La.App., 149 So. 147; Plummer v. Gulf, M. N.R. Company et al., La.App., 153 So. 322; Jones v. Texas Pacific Railway Company, La.App., 154 So. 768.
Counsels' position, of course, becomes untenable when the conclusion is reached that the crossing was free of atmospheric conditions at the time of the accident, of such character as to materially interfere with visibility. This conclusion brings the case squarely within the general rule that the presence of a train across a highway is adequate notice and warning to motorists that the road is blocked. The rule is also well established that a motorist is required for his own safety and protection, if for no other reason, to maintain such rate of speed and lookout as will enable him to stop his vehicle within the distance illumined by its lights. This rule, a safe and sane one, when observed, serves to avert hundreds of accidents which would certainly occur but for such observance. Had the decedent observed the rule, he would doubtless be living today.
The Squyres case typifies the exception to the general rule above stated. Comment on the case because of its exceptional features, has not been confined to this state. To clearly show that the basic facts of that case are wholly different from those of the case at bar, we quote from comment thereon appearing in Louisiana Law Review, Volume 2, page 93, viz: "Here the defendant's train of fifteen cars was being shunted across a highway upon which plaintiff was riding by automobile during a heavy snowstorm at night. The cars were being shifted along a little-used private spur line. Visibility was exceedingly poor and the defendant's cars were cloaked in snow so as to present a dull gray appearance which harmonized with the surrounding countryside. The automobile in which the plaintiff rode as a guest was progressing at a rate of speed not in excess of 15 miles per hour. Although plaintiff's host was driving with his head protruding through the side window so as to aid his vision, he did not perceive the freight cars until it was to late to avoid a collision. The defendant contended, inter alia, that no negligence on its part had been alleged and proved."
The lower court, after absolving the defendants from any negligence as a cause or contributing cause of the accident, said:
"The physical facts appear to indicate a high speed the heavy truck made with the gondola car, and the almost complete smashing up of the front part of the truck; also the sound of the impact heard by a number of witnesses as well as the very great injury suffered by Mr. Domite. These physical facts impel the court to the conclusion that Mr. Domite was driving at a high rate of speed, entirely too great a speed for safety under the circumstances.
"Mr. Domite, it is shown by the records, was familiar with the highway; that he had been traversing this highway both in the day time and at night time for some considerable length of time and undoubtedly knew well the location of this spur track crossing, and the highway at the point that it does cross it; that switching operations were carried on in the day time and night time over this track. The court feels that it cannot do otherwise than conclude that Mr. Domite's unfortunate accident and death was caused by his own negligence, which negligence constituted the proximate cause."
The record abundantly supports this factual resolution. It clearly discloses that young Domite heedlessly drove the truck at a rapid speed, slightly down grade to the crossing, the existence of which was well known to him. The testimony proves that *Page 60 
the truck's speed immediately prior to the accident was not reduced to any extent. Bailey testified he did not know whether the brakes were applied. He says he saw the train across the road when only thirty feet from it, and assumed that Domite saw it at the same time. He also was injured from the impact.
The witness, Bailey, signed two statements covering the facts of the accident within a week thereafter. In the first statement he said that it was dark when he and decedent left the camp "but quite foggy", so much so that the dimmer lights were turned on. He did not in this statement say that there was any fog at the crossing. In the second statement he said that he did not remember whether they were driving through fog when the accident occurred. He also stated therein that Domite was driving at from forty-five miles to sixty miles per hour after leaving the camp, which speed he thought was too fast in view of weather conditions, whereas in the first statement he said that decedent was driving at a reasonable and safe rate of speed and that he knew they were approaching the crossing, but saw no obstruction thereon.
As a witness in the case, Bailey's testimony, in material respects, was contradictory of the statements made by him in one or both of the written documents, especially as regards the fog and the truck's speed. For the purpose of contradicting the testimony of this witness, and to impeach him, defendants offered in evidence without restrictions, both of the signed statements. Plaintiff contends that as these offerings were made without restriction, defendants are bound by their contracts, especially those parts relating to the fog. The contention is extremely technical. It would be absurd to hold that defendants unwittingly introduced evidence which would have the effect of destroying their principal defense. Bailey was a most unsatisfactory witness, and his testimony as a whole, when considered in connection with the two statements, is, to a large extent, irreconcilable. Defendants simply wished to place in the record for the court's benefit everything said by Bailey in connection with the accident to the end that his testimony might be properly appraised in the light of what he said. We do not think the offerings should be given the effect argued by plaintiff's counsel. We see no merit in plaintiff's position on this issue.
For the reasons herein assigned, the judgment appealed from is affirmed and plaintiff is cast for all costs.
DREW and HAMITER, JJ., concur.