91 So.2d 865 (1956)
Edna SENEGAL (Sam MULLER, Jr., Substituted as Plaintiff)
v.
Guy A. THOMPSON, Trustee of Missouri Pacific Railroad Co. et al.
No. 4136.
Court of Appeal of Louisiana, First Circuit.
November 26, 1956.
Rehearing Denied January 22, 1957.
Writ of Certiorari Denied February 27, 1957.
*866 Hudson, Potts, Bernstein & Davenport, Monroe, Kaufman, Anderson, Leithead & Scott, Lake Charles, for appellant.
Plauche & Stockwell, J. R. St. Dizier, Lake Charles, for appellees.
ELLIS, Justice.
On October 24, 1951, at about 11:30 P.M. a car, stolen or at least being used without the consent of the owner, was being driven by Burwick Harris, with Joseph Senegal, Jr., as a passenger on the front seat, and Sam Muller, Jr., as a passenger on the rear seat, ran into the side of a red box car which formed one of forty-nine freight cars and a switch engine that had been stopped with the designated car across Louisiana Highway 42. This crossing is on the eastern edge of the city limits of Lake Charles, Louisiana.
As a result of the collision Harris, the driver of the car, and Senegal, the passenger on the front seat, were killed and Muller was seriously injured. Three separate actions were filed against the Trustee of the railroad and the train engineer as co-defendant. The suit against the train engineer was dismissed on a holding that there was a lack of control as well as responsibility for the negligent conduct of the railroad. There was no appeal taken from this ruling.
The cases were consolidated for trial as well as for argument in this court, with separate decrees having been rendered by the District Court and to be rendered by this Court. The District Court rendered judgment in favor of Sam Muller, Jr., in the principal sum of $8,651.50, and the railroad has appealed. Judgment was rendered against the mother of Burwick Harris dismissing her suit at her cost on the ground of the contributory negligence of Harris as the driver of the car, and she has appealed. The suit by the father of Joseph Senegal, Jr., passenger on the front seat and who was also killed in the accident, was dismissed at his cost on the ground of contributory negligence, and hence an appeal.
While the record contains some thirteen hundred pages, the legal and factual issues are not complicated. The main question at issue in this case is whether the crossing in question under the facts and settled jurisprudence was of such a hazardous nature as to require the railroad to station a flagman, lighted flares, fusees or other special warning devices at the crossing immediately prior to the time the accident occurred.
Our learned brother of the Lower Court in his written opinion has correctly found from the evidence the basic facts necessary, when considered in the light of the established jurisprudence to arrive at a correct conclusion with regard to the hazardous or non-hazardous nature of the crossing at the time of the accident. We take the liberty of quoting that portion of the Lower Court's opinion dealing with the basic facts surrounding the actual conditions *867 at the crossing at the time of the accident, together with a statement of the established jurisprudence laying down the rule by which the courts are to be guided. We quote:
"The evidence indicates that at about 11:30 P.M. on October 24, 1951, Burwick Harris, Joseph Senegal, Jr., and Sam Muller, Jr., were riding in a 1947 model Chevrolet sedan in a northerly direction on Louisiana Highway 42 in Calcasieu Parish. The automobile was being driven by Harris. Senegal was seated in the front seat to the right of the driver, and Muller was in the rear seat. An accident occurred at the point where the tracks of the main line of the Missouri Pacific Railroad, owned and maintained by defendant Guy A. Thompson as Trustee of the Missouri Pacific Railroad Company, cross Louisiana Highway 42 on the eastern edge of the city limits of Lake Charles.
"The highway at the scene of the accident is a blacktop highway approximately 20 feed in width, running north and south, and it is fairly straight for a considerable distance on either side of the railroad crossing. The railroad track runs approximately east and west at that point, and it crosses the highway at about a 90-degree angle. The surface of the track at the site of the crossing is higher than the surface of Highway 42 South of such crossing. According to an actual survey, it appears that the surface of the highway is 1.3 feet lower than the railroad track at a point 100 feet south of the crossing, is 1.6 feet lower at a point 200 feet south of the crossing, and is two feet lower than the surface of the crossing at a point 400 feet south of such crossing.
"There were two signs located south of the track designed to give notice to a motorist approaching from the south that such crossing existed. One of those signs was the usual yellow highway marker, located on the east side of the highway approximately 350 feet south of the railroad track. The other sign was the regular Louisiana stop law sign located along the east side of the highway approximately 30 feet south of the track. There were no flashing signals or lighted signs of any kind giving notice to approaching motorists of this crossing, and no additional warning devices other than the two signs hereinabove described existed at that point. At the time the accident occurred it was dark, but the weather was clear and the highway was dry.
"The only building in the immediate vicinity of the railroad crossing was one located east of the highway and south of the railroad track, which building was used for the bulk distribution of Pan Am gasoline products. The center of the railroad crossing was approximately 75 feet from the nearest corner of the building. At the time the accident occurred there were five 100-watt light bulbs burning on or in the vicinity of that structure, one on each of the four corners and another on the south side of the building. Only the two lights located on the southwest and northwest corners of the building, however, were in such a position that they might have illuminated trains on the crossing. After reviewing the evidence, this Court is convinced that, because of the location and low wattage of these lights, the slight illumination which they provided of that crossing was effective only at very close ranges, and thus the lights on the Pan Am building were of little or no assistance to motorists approaching from the south in detecting the presence of a standing box car on that crossing.
"The railroad yards of the Missouri Pacific Railroad, consisting of a number of switch tracks, a car repair shed, a yard office and other necessary improvements, was located immediately west of this crossing. The car repair shed was located a little less than 800 feet west of Highway 42, it being the nearest building west of the crossing. Numerous `switching' operations were conducted daily in the railroad yard, and this crossing was used frequently *868 during all hours of the day and night for the purpose of switching or making up trains, as well as for the passage of freight and passenger trains to and from Lake Charles.
"Several minutes prior to the time of the accident a freight train operated by defendant railroad company, consisting of a switch engine and a cut of 49 cars, occupied this crossing. The locomotive was being operated by defendant McDermott, the engineer, and by J. L. Fordham, the fireman. McDermott was stationed in and on the right side of the cab of the locomotive, and Fordham was on the left side of the cab.
"This train was travelling in an easterly direction at the time it first occupied the crossing, and it was brought to a stop when the switch engine or locomotive reached a point approximately 2,000 feet east of Highway 42. While the train was standing after being brought to such a stop, the 44th car, a red boxcar, completely blocked the highway, the center of said car being approximately over the center of the highway. This box car was about 44 feet in length, and since the hard surfaced portion of the highway was only 20 feet wide, it is apparent that while the car was standing in that position its wheels were located on either side of the hard surfaced portion of the road, on or beyond the shoulders of the highway. The train was in that position at the time the accident occurred. The point of impact was approximately in the center of the highway, and the automobile involved in the accident struck the 44th car of the train almost in the center of that car.
"Between the time the train was brought to a stop and the time of the accident, R. E. Harris, an employee of defendant railroad, was standing near the west end of the 49th car, or approximately 200 feet west of the crossing, and two other employees of defendant, D. L. Moss and J. V. Duhon, were standing near the railroad track approximately 600 feet west of the crossing. All of these employees carried lighted lanterns, but they were too far from the highway to enable them to warn the approaching vehicle of the fact that the crossing was occupied. No other employee of defendant company or any other person was stationed at or near the crossing for the purpose of warning approaching vehicles.
"The train remained stationary, with the 44th car completely occupying the crossing, for a period of from three to five minutes immediately prior to the time of the accident. A few seconds before the collision occurred one of defendant's employees gave a back-up signal with his lantern to engineer McDermott. The engineer, in response to this signal, blew the whistle of the train signifying that it was to back up, and he immediately caused the train to begin moving in a westerly direction. The accident occurred at or about the instant the back-up signal was given, and thereafter the railroad employees stationed west of the highway promptly signaled for an emergency stop. As soon as this signal was given, engineer McDermott blew the emergency stop whistle and brought his train to a stop. The 44th car, however, moved in a westerly direction a distance of approximately 18 feet after the accident occurred before it was brought to a stop.
"The evidence indicates that the automobile was being driven at a speed of between 50 and 60 miles per hour immediately before and at the time of the accident. It apparently was in good mechanical condition, and the headlights and brakes functioned properly.
"The engineer rang the bell of the locomotive just prior to and at the time he entered the intersection, but he discontinued ringing it immediately after the train occupied the crossing. The bell was not rung, the whistle was not blown, and no other audible signal was given to warn approaching motorists of the fact that the highway was obstructed from the time the train first *869 entered the intersection until the back-up whistle was blown almost simultaneously with the occurrence of the accident. There is a dispute as to whether the bell or whistle signals could have constituted adequate warning to approaching motorists of the fact that the highway was obstructed since the locomotive, while standing, was approximately 2,000 feet east of the highway. This court is convinced that, because of the distance between the locomotive and the crossing, bell or whistle signals would not have been effective as a warning to approaching motorists while the train was standing.
"Plaintiffs contend that defendants were negligent in failing to station flagmen, to place lighted signals or to install other effective warning devices at the crossing to warn approaching vehicles, and particularly the vehicle involved in this accident, of the fact that the crossing was blocked.
"The general rule, as established by the jurisprudence of this State, is that in the absence of special statutes or ordinances a railroad company is not required to station a flagman at a crossing to warn approaching motorists of the fact that the crossing has been blocked or occupied by a train, nor to place lights or other signals at such crossing for that purpose, unless there are such unusual and dangerous conditions at the crossing as to make such precautions necessary. Plummer v. Gulf M. and N. R. Co., La.App., 153 So. 322; Aaron v. Martin, La.App., 167 So. 106; Domite v. Thompson, La.App., 9 So.2d 55; Ramsey v. La. and A. R. R. Co., La.App., 70 So.2d 171; Smith v. Texas & N. O. R. Co., La.App., 70 So.2d 175.
"Plaintiffs contend, however, that the facts presented in the cases now being considered bring each of said cases within the exception to that general rule; that the unusual circumstances existing at that crossing were such that defendant railroad company was under a duty to station flagmen or guards, or to provide lighted signals or other adequate warning devices to warn motorists approaching that crossing of the fact that the highway was obstructed, and that the failure of the railroad to provide that type of warning constitutes negligence.
"A number of authorities have been cited by counsel for both parties in support of their opposing arguments on the issue of whether this crossing was unusually hazardous. In most of the cases cited where a motor vehicle ran into a standing train or boxcar, the courts have applied the general rule, which is to the effect that the presence of the train itself is sufficient warning to motorists that the highway is obstructed. In some cases, however, the courts have held that because of the hazardous nature of the crossing the presence of the train or boxcar did not constitute sufficient warning to approaching motorists, and that the railroad company was under a duty to station flagmen or to use lighted signals, fusees, or other warning devices to warn the drivers of approaching vehicles of the fact that the highway was obstructed."
The District Court then discussed some of the jurisprudence and then concluded:
"The elevation of the track above the surface of the road is one of the circumstances or conditions which plaintiffs contend causes that crossing to be particularly hazardous. It is argued that a motorist approaching this crossing from the south at night is not able to see a standing boxcar on the crossing unless the boxcar is silhouetted by the lights of automobiles approaching from the opposite direction and, even then, the boxcar cannot be seen unless the wheels of such car move across the lighted background. The evidence indicates that the lights of an automobile approaching this crossing from the south would reveal the presence of a boxcar blocking this crossing if the lights were on `bright' and the beam is raised for ordinary highway driving. This Court is convinced, however, that if the lights were deflected downward, as is customarily done for town driving or while meeting *870 other vehicles, the lights would not illuminate a standing boxcar at this crossing until the automobile reached a point very close to the crossing. Since Highway 42 is a heavily travelled thoroughfare and this crossing is located on the outskirts of the City of Lake Charles, the driver of a vehicle along that highway might reasonably be expected to drive with the beams of his headlights deflected. This Court concludes that the elevation of the track above the surface of the road and the fact that the blacktop highway reflects very little light are conditions which render the crossing more hazardous than it would be if these two conditions did not exist."
In addition, the District Court accepted the testimony of Mr. H. A. Flanakin, Civil Engineer, who was at that time employed as highway engineer for the American Trucking Associations, Inc., and who was on a year's leave of absence as Associate Professor of Highway Engineering at Louisiana State University. This witness' testimony was based upon a formula commonly known as the "Peabody-Dimmick" formula which will be discussed hereafter. The District Judge also commented upon the testimony of other witnesses with regard to their opinion of the formula and the crossing, as well as a resolution of Traffic and Safety Committee of the Lake Charles Association of Commerce requesting the railroad prior to the time of this accident to install lighted signals and control devices at the crossing.
After thoroughly discussing the law and the evidence, the Court concluded:
"* * * In view of the large number of exposures which occur daily at this crossing, the fact that the highway at that point is a heavily travelled suburban thoroughfare, the absence of any effective lighting or illumination of the crossing, the lack of more adequate warning devices or procedures, the opinion expressed by Mr. Flanakin and the results obtained from applying the scientific formula described by him, the elevation of the track above the surface of the road, and the fact that the blacktop highway reflects little light, this Court concludes that the crossing is unusually hazardous. Defendant Guy A. Thompson, as Trustee, through his agents, was formally notified of this condition prior to the time of the accident, and the evidence indicates that the railroad at least could have stationed flagmen or fusees at the crossing. Under those circumstances defendant Thompson, as Trustee of the Missouri Pacific Railroad Company, was negligent in failing to station flagmen, lighted signals, fusees or other proper warning devices at that crossing immediately prior to the time the accident giving rise to these suits occurred."
It is clear that the District Judge relied heavily upon the testimony of Mr. Flanakin who in turn relied heavily upon the "Peabody-Dimmick" formula; secondly, elevation of the track above the surface of the road, and thirdly, the fact that the blacktopped highway reflects little light, in order to reach the conclusion that the crossing was unusually hazardous and that the railroad, therefore, was negligent in failing to station flagmen, lighted signals, fusees or other proper warning devices at the crossing prior to the time of the accident.
From the record as well as from the facts found by the District Court the elevation at this crossing is of no consequence in that the surface of the highway is two feet lower than the surface of the crossing at a point 400 feet south of the crossing, and 1.6 feet lower at a point 200 feet south of the crossing, and 1.3 feet lower at a point 100 feet south of the crossing. This slight and gradual elevation of the highway should be of no consequence insofar as obstructing the view of a boxcar across the intersection of the highway and, in fact, according to the finding of fact on the plea of contributory negligence under dismissal of the suit filed on behalf of the father of Burwick Harris, Driver of the car, and of the father of Joseph Senegal, Jr., the passenger on the front seat, and of the suit by Sam Muller, Jr., on his own *871 behalf there is no merit in a conclusion that this slight elevation obstructed the view of the box car by the occupants of the automobile. The District Court in dealing with the question of contributory negligence of the occupants of the car, correctly found the following:
"The evidence establishes to the satisfaction of this Court that Burwick Harris, driver of the automobile, was negligent in driving at an excessive rate of speed, in failing to keep the vehicle under such control that he could bring it to a stop within the range of his vision, and in failing to maintain a proper lookout. His negligence contributed to and constituted a proximate cause of the accident, and for that reason the demands of plaintiff in the case entitled `Beulah Harris vs. C. R. McDermott et al.,' bearing No. 31,399, must be rejected.
"The evidence also establishes that Joseph Senegal, Jr., who was in the front seat immediately to the right of the driver, voiced no protest and made no effort to warn Burwick Harris of the danger or to persuade him to exercise caution. Although he may not have seen the train, and the Court is convinced that it was difficult to do so, his attention was called to the fact that it occupied the crossing by Muller, one of the other occupants of the car. As a guest or passenger in the automobile, it was his duty to warn the driver of the danger and otherwise exercise ordinary care to protect himself. His neglect to do so constituted a contributory or proximate cause of the accident. The demands of plaintiff in the case entitled `Joseph Senegal v. Guy A. Thompson, Trustee,' bearing No. 31,116, also must be rejected.
"The evidence also establishes that Joseph Senegal, Jr., who was in the front seat immediately to the right of the driver, voiced no protest and made no effort to warn Burwick Harris of the danger or to persuade him to exercise caution. Although he may not have seen the train, and the Court is convinced that it was difficult to do so, his attention was called to the fact that it occupied the crossing by Muller, one of the other occupants of the car. As a guest or passenger in the automobile, it was his duty to warn the driver of the danger, and otherwise exercise ordinary care to protect himself. His neglect to do so constituted a contributory or proximate cause of the accident. The demands of plaintiff in the case entitled `Joseph Senegal v. Guy A. Thompson, Trustee,' bearing No. 31,116, also must be rejected.
"Sam Muller, Jr., testified that he saw the boxcar at the crossing some time before the collision occurred, and that he told Harris, the driver, that `he better slow up before he hit that train.' The driver replied, however, that Muller `could not teach him how to drive.' He testified that he asked the driver to slow down `about three or four times,' but that his requests were ignored. The only available evidence as to what occurred in the automobile immediately prior to the time of the collision is the testimony of the only surviving occupant of the car, Sam Muller, Jr., who is also one of the plaintiffs in the suits now before the Court. Although this witness has an interest in the outcome of the case, this Court believes that he has endeavored to give an accurate account of what occurred.
"It, of course, is the duty of a guest or passenger in a motor vehicle to exercise ordinary care for his own safety, and where reasonably necessary to warn the driver of impending danger and to take such other reasonable steps as are necessary for his own protection. This Court concludes that the action of Sam Muller, Jr., in warning the driver of the danger and requesting him to slow down three or four times immediately prior to the time of the collision was all that he reasonably could be expected to do under the circumstances, and thus he was not contributorily negligent." (Emphasis added.)
*872 The District Court reached the conclusion that the lights on the automobile would not illuminate a standing box car at this crossing until the automobile reached a point very close to the crossing. There is no testimony to this effect other than the evidence of the slight elevation of six inches to one hundred feet, approximately, upon which to base this conclusion. Acknowledging the elevation of the crossing as shown by the record, it is plain that at a distance of 400 feet, if the lights illuminated that far, and which was possible if they were on bright, the lights at the 400 foot point would be two feet higher than they would have been if the road was level. There is no testimony as to the distance from the bottom of the box car to the ground, but it is certain that due to the height of the box car it would have been illuminated by the lights of the approaching automobile. At 200 feet according to the testimony the occupants of the car were only derived of 1.6 feet of illumination, and only 1.3 feet at 100 feet.
The District Court also found that due to the heavily travelled thoroughfare and the fact that this crossing is located on the outskirts of the City of Lake Charles that the driver "might reasonably be expected to drive with the beams of his headlights deflected." The testimony fails to reveal that the highway in question at the time of the accident was heavily traveled or that there were any cars approaching the automobile involved in the accident due to the fact that it happened at approximately 11:30 at night on the eastern outskirts of the City of Lake Charles. It might be just as reasonable or logical to conclude, and it would certainly have been safer under the circumstances as well as proper, that the light were on bright rather than dim, however, the burden of proof was upon the plaintiffs, and if it was a matter of necessity to the plaintiff's case to establish that the lights were on dim, he bore the burden of proof and should have done so, otherwise such a conclusion is not justified.
Above all, however, may we emphasize again that the District Court found as a matter of fact that the testimony of Muller was truthful to the effect that he saw the box car and the train and called it to the attention of the driver and front seat passenger more than once, and under these facts and circumstances and the absence of any unusual weather conditions, it was a clear dark night, the lights on the automobile were apparently in good condition, the train was seen, as shown by Muller's testimony, the sole and proximate cause of this accident was the negligence of the driver Harris, and of Senegal, Jr., who voiced no protest and made no effort to warn Harris, although, as specifically found by the District Court "his attention was called to the fact that it occupied the crossing by Muller * * *."
The "Peabody-Dimmick" formula advanced by the witness Flanakin is valueless when viewed in the light of the jurisprudence and of the basis of the formula as shown by the testimony. This formula is used by the United States Bureau of Public Roads as a basis of determining which crossings should be given priority in the allocation of Federal funds, and is based upon two factors insofar as the selection of the crossings for the spending of Federal funds on warning protection was concerned. These two factors are the amount of railroad traffic over the crossing and the amount of motor vehicular traffic over the crossing. In other words, a railroad crossing with no admitted hazards in itself, due to elevations or obstructions to view or any other imaginable condition, which would make the crossing per se hazardous, would be considered a hazardous crossing under the "Peabody-Dimmick" formula if it had a certain amount of railroad traffic and a certain amount of motor vehicular traffic. For example, a crossing could be hazardous per se, but unless the railroad traffic and motor vehicular traffic reached a certain amount or number, under the "Peabody-Dimmick" formula it would not be hazardous *873 crossing. From a legal standpoint and the jurisprudence, if one person uses the crossing per day and the crossing is per se hazardous by virtue of obstructions or a heavy fog or sleet or snow or elevations or other hindrances to view, and the railroad under such conditions places a box car across the crossing without any flagman or lights or other warning, under the jurisprudence this would be negligence. The "Peabody-Dimmick" formula, according to the record, does not consider any negligence on the part of those running into the train even though the crossing is not rendered hazardous by virtue of its location or any outside facts or circumstances.
The testimony of the originators of the "Peabody-Dimmick" formula was that it was not devised to test the negligence of a railroad with reference to the facts necessary to render a crossing hazardous under our jurisprudence.
With regard to the particular crossing in question, Mr. I. L. Thomas, Jr., Traffic and Planning Engineer of the Louisiana Department of Highways, testified that he was familiar with the "Peabody-Dimmick" formula but that in his opinion many factors in addition to the main ones used in working out that formula must be considered in determining whether a crossing is unusually hazardous, and that any ratings made in accordance with the formula in Louisiana were used solely for the purpose of determining how the public funds should be spent. He did not think the formula could be used with any degree of reliability in determining whether a crossing is hazardous.
Charles F. Middleton, train and traffic officer of the Louisiana State Police, testified that he had had considerable experience in law enforcement and accident prevention, that he had examined this crossing in question on many occasions and that in his opinion it was no more hazardous than any other railroad crossing. In other words, there was nothing that would render this crossing hazardous per se.
It is true that, as commented upon by the District Judge, the Traffic and Safety Committee of the Lake Charles Association of Commerce had requested warning signals because they thought that the number of accidents rendered the crossing hazardous. The Railroad company acknowledged the receipt of this letter or resolution and a portion of their answer is as follows:
"In our investigation of the need of crossing protection at this location it developed that there have been three serious accidents on this crossing where vehicles ran into the side of train. Route 42 is a straight north and south black top highway, crossing the main track at about 90 degree angle, while a yard track crosses this highway at an angle of about 21 degrees. The accidents that have happened have been mostly when there were heavy fogs which roll in from the Gulf at night."
The District Court correctly evaluated the resolution and letters with regard to this crossing when it said: "Although the resolutions and letters above described do not constitute proof of the fact that a hazardous condition actually existed at this crossing, * * *."
Let us now examine some of the cases with a view of determining what facts are necessary to abrogate the general rule recognized and stated by the District Court that a railroad company is not required to station a flagman at a crossing to warn approaching motorists of the fact that the crossing has been blocked or occupied by a train, nor to place lights or other signals at such crossings, for that purpose, unless there are such unusual and dangerous conditions at the crossing as to make such precautions necessary.
In Plummer v. Gulf M. & N. R. R. Co., La.App., 153 So. 322, 323, this Court stated:
"`It has not been shown from the situation of the switch track across *874 the highway at this point and the conditions confronting the drivers of motor cars along the highway were such as would require the railroad company to station a flagman with the usual lantern signal on both sides of the approach to the switch track to warn approaching motorists. As stated above, there were no obstructions to cut off the view of a motorist traveling the highway going either direction some distance from the crossing, which would make it possible for the driver of a car to see a train standing across the track in ample time to stop his car if the headlights on the car were burning properly. The evidence shows that in this case there was no such flagman placed to warn approaching motorists on the highway, but as a matter of law the defendant railroad company was under no such duty to place such flagman to give warning to approaching motorists. Sweeney v. Missouri Pacific Railroad Co., La.App., 149 So. 147. Therefore it follows that plaintiff has not shown negligence against the railroad company on this ground.
"* * * However, as held in the case of Gulf M. & N. Railroad Co. v. Kennard, [164 Miss. 380, 145 So. 110] supra, and cases there cited, a railroad company is not required as a matter of law to have a light on a coach or box car placed across a highway or street in its switching operations unless there is some peculiar and special danger, and unless there is some obstruction to prevent an approaching motorist from seeing the car or coach across the track on approaching it along the highway with the lights on the automobile burning in the usual manner. * * *'
* * * * * *
"The evidence shows that the coach had been placed across the highway only for two or three minutes before George Rouse ran against it with his truck. The traveling public can expect that the switches in the yards of railroad companies may be so occupied temporarily by their coaches in operating their trains.
"A case of this character is entirely different from one where a highway is blocked by an auto, truck, or other obstacle. In such a case, the party blocking the highway must warn approaching travelers of the danger ahead for the reason that they do not anticipate that they will meet such obstacles on public roadways or highways. The warning usually given by one thus blocking a highway is by means of a lantern, moving light, or other equally safe method.
"In the instant case no such warning was necessary as the travelers on that highway could expect that the crossing would be temporarily occupied or blocked in the operation of the defendant's trains while carrying on its legitimate business. * * *"
The holding in the case of Squyres v. Baldwin, 191 La. 249, 185 So. 14, 17, with Chief Justice Fournet as organ of the Court, gave an exhaustive review of the law with full recognition of the general rule as well as the exception thereto. The court stated:
"`The view generally taken is that the presence of a train of cars at a crossing is sufficient notice of obstruction and of danger, that the railroad company is not bound to give any further warning as to the presence of such obstruction, and that the trainmen have a right to assume that the operator of the vehicle will act in a reasonable way to avoid a collision. * * * There is, however, authority for the view that conditions may be such as to require a warning where, in the darkness, a car obstructs a crossing.' 52 Corpus Juris, sec. 1782, pp. 190, 191. (Italics ours.)
*875 "On the same subject matter we find, in Huddy's Ency. of Automobile Law (9th Ed.) Vols. 7-8, pp. 129, 130, that `* * * in the absence of statutory requirement, the mere leaving of a train across the highway without lights or other signals to disclose its presence there is not per se negligence; as to injuries received by running into the train, the obstruction of the highway is not to be considered as the efficient cause of such injuries but merely as a condition which in and of itself furnishes no cause of action. In order to charge the railroad with negligence in such case it must be shown that defendant's employees in charge of the train, in the exercise of reasonable care, ought to have known that on account of darkness the cars upon the crossing were such an obstruction that people traveling upon the highway in automobiles properly equipped with lights and carefully operated at a reasonable rate of speed would be likely to come into collision with them.' (Italics ours.) See also, Dobrowolski v. Holloway Gravel Co. Inc., La.App.1937, 173 So. 474; Plummer v. Gulf, M. & N. R. Co. (Hampton v. Gulf, M. & N. R. Co.), La. App., 153 So. 322; Trask v. Boston & M. R. R., 219 Mass. 410, 106 N.E. 1022; Miller v. Atlantic Coast Line R. Co., 140 S.C. 123, 138 S.E. 675, certiorari denied Camp Mfg. Co. v. Miller, 275 U.S. 556, 48 S.Ct. 117, 72 L.Ed. 424; Aymond v. Western Union Telegraph Co., 151 La. 184, 91 So. 671; Maher v. Louisiana Ry. & Nav. Co., 145 La. 733, 82 So. 872.
"In A.L.R., Vol. 99, p. 1455, the exception is stated as follows:
"`* * * the railroad company's duty is not necessarily discharged under all circumstances if it fails to give warning in some form of the presence of the obstruction. The atmospheric conditions, obscurity, and darkness of the crossing, the length of time it is obstructed, and the nature of the highway, may require the warning be given if the company is to be found in the exercise of due care.' (Italics ours.)
* * * * * *
"In the case at bar the falling snow was unusually heavy and dense, the ground and concrete pavement were covered with it and the night was as dark as Erebus itself. U. S. Highway No. 165 accommodates a heavy stream of traffic, as it is a main artery of travel in the state highway system, connecting central Louisiana with numerous points south and southwest thereof. The spur track is level with the pavement and used only occasionally for the benefit of the Alexandria Gravel Company and usually at night, while the railroad signs there located were, when the collision occurred, concealed by the falling snow. The low, black gravel cars were rendered a dull grey color in appearance, by reason of the snow which blanketed them, and blended perfectly with the full, leadened background.
"It is true that the engine's bell and whistle were sounded at times during the switching, but Johnson (the driver) and the plaintiff both testified that they heard no such signals and their testimony is supported by the fact that a strong northerly wind was blowing, which, according to the direction they were travelling, carried the sounds from them.
"We are therefore of the opinion that defendant's employees in charge of the train, exercising reasonable care, ought to have known, on account of the darkness, the falling snow, and the cross-switching, that the train was such an obstruction that people traveling upon Highway No. 165 in automobiles properly equipped with lights and carefully driven at a reasonable rate of speed might have come into collision *876 with them, and it was their duty to protect the traveling public against this peril, created by them, by giving such warning as the conditions warranted. Having failed to do so, they were negligent."
In Domite v. Thompson, 2 Cir., La.App., 9 So.2d 55, 57. The court stated the following:
"The accident alleged upon happened at the same crossing as that involved in Squyres v. Baldwin et al., decided by this court, 181 So. 584, and affirmed by the Supreme Court under writ of review 191 La. 249, 185 So. 14. In that case a heavy snow storm created unusual and extraordinary atmospheric conditions at and about the locus of the crossing whereas a heavy fog is alleged to have done so in the present case.
* * * * * *
"* * * There are no trees, buildings or other view obstructing agencies on either side of the road near the crossing. The customary `Louisiana Law Stop' signs and smaller highway markers are properly located to warn motorists of the presence of the spur track.
* * * * * *
"Deceased was well acquainted with the physical conditions where the accident occurred and well knew that the spur track was there and that it was regularly used to transport cars across the highway to the gravel pit.* Bailey also knew that the track crossed the road there.
"* * * The train was then stopped for a brief time to enable the brakeman to couple these two cars to the train. While this was being done, the accident occurred. The train had been stopped not more than three or four minutes.
"Plaintiff contends that the fog which enveloped the area about the crossing was so dense and the traffic over the highway so heavy that this case falls within the court's holding in the Squyres case, supra. It was held in that case, as reflected from the syllabus:
"`That motorist and guest were on public highway on a dark night when heavy snow was falling which limited motorist's visibility to 25 feet did not constitute negligence on the part of motorist and guest, as respects guest's right to recover for injuries sustained when automobile collided with train.
* * * * * *
"`Where railroad, without stationing trainman with visible warning signal at crossing, permitted gravel cars to obstruct crossing on seldom used spur track on dark night during heavy snowstorm, and visibility was so poor as to conceal railroad crossing signs, railroad was liable for injuries to guest in automobile which collided with train, since railroad was guilty of negligence which proximately caused collision.'
* * * * * *
"But they argue that the facts of this case bring it within the exception to that general rule also appearing on the same page of that work, to-wit: `However, the railroad company's duty is not necessarily discharged under all circumstances if it fails to give warning in some form of the presence of the obstruction. The atmospheric conditions, obscurity, and darkness of the crossing, the length of time it is obstructed, and the nature of the highway, may require that warning be given if the company is to be found in the exercise of due care. The recent decisions support these general propositions.'"

*877 * * * * * *
"Counsels' position, of course, becomes untenable when the conclusion is reached that the crossing was free of atmospheric conditions at the time of the accident, of such character as to materially interfere with visibility. This conclusion brings the case squarely within the general rule that the presence of a train across a highway is adequate notice and warning to motorists that the road is blocked. The rule is also well established that a motorist is required for his own safety and protection, if for no other reason, to maintain such rate of speed and lookout as will enable him to stop his vehicle within the distance illumined by its lights. This rule, a safe and sane one, when observed, serves to avert hundreds of accidents which would certainly occur but for such observance. Had the decedent observed the rule, he would doubtless be living today.
"The Squyres case typifies the exception to the general rule above stated. Comment on the case because of its exceptional features, has not been confined to this state. To clearly show that the basic facts of that case are wholly different from those of the case at bar, we quote from comment thereon appearing in Louisiana Law Review, Volume 2, page 93, viz.: `Here the defendant's train of fifteen cars was being shunted across a highway upon which plaintiff was riding by automobile during a heavy snowstorm at night. The cars were being shifted along a little-used private spur line. Visibility was exceedingly poor and the defendant's cars were cloaked in snow so as to present a dull gray appearance which harmonized with the surrounding countryside. The automobile in which the plaintiff rode as a guest was progressing at a rate of speed not in excess of 15 miles per hour. Although plaintiff's host was driving with his head protruding through the side window so as to aid his vision, he did not perceive the freight cars until it was too late to avoid a collision. The defendant contended, inter alia, that no negligence on its part had been alleged and proved.'"
The recent case of Ramsey v. Louisiana & A. Ry. Co., La.App., 2 Cir., 70 So.2d 171, 172, is one wherein the court reviewed and reaffirmed the jurisprudence concerning the general rule and the facts and circumstances necessary to bring a case under the exception thereto. In this case the following facts were found and conclusions reached:
"The evidence shows that the train involved was a freight train of the defendant on a regular run from Greenville, Texas, to Shreveport, Louisiana, consisting of the locomotive, 82 cars, and a caboose. The train, upon arriving in the City of Shreveport and in approaching the freight yards, crossed the Jewella road and came to a standstill at a point on said train about 17 or 18 car lengths behind the locomotive. An employee alighted from the train and telephoned the railroad yard office to ascertain if the track was clear for the train to proceed. Information was given that a switch engine was proceeding in that direction, which necessitated the incoming freight to back to a switch in order to permit the meeting of the two. This operation consumed only a few moments' time, possibly not more than five minutes. No flagman was stationed at the street crossing to warn traffic of the presence of the train. There were no unusual atmospheric conditions or interferences, such as fog, dust, mist, snow or rain to prevent or obstruct normal night vision.
* * * * * *
"The general rule relative to negligence of a railroad in a factual situation *878 such as we find here has been stated in 44 Am.Jur., p. 741, `Railroads', Section 501, as follows:
* * * * * *
"The same authority states an exception to the general rule in this language:
"`However, the railroad company's duty is not necessarily discharged under all circumstances if it fails to give warning in some form of the presence of the obstruction. The atmospheric condition, obscurity and darkness of the crossing, the length of time it is obstructed, and the nature of the highway, may require that warning be given if the company is to be found in the exercise of due care, but in order to charge a railroad company with negligence in leaving an unlighted train across the highway in the night so as to make it liable for injury to an automobilist traveling on the highway running against it, the employees in charge of the train must, in the exercise of reasonable care, have knowledge that on account of the particular facts or situation involved people traveling along the highway in automobiles properly equipped with lights, and carefully operated at reasonable speed, would be likely to come into collision with the cars unless lights are placed on them to warn of their presence.' [Emphasis added.]
* * * * * *
"It is clear, in our opinion, that no negligence of the defendant or of its agents and employees, contributed to plaintiff's driving into and colliding with the side of the train. There are no unusual or extraordinarily dangerous conditions, facts or circumstances at the crossing. The train was stopped in order for a member of the crew to telephone the yard office and would have continued on in a few minutes' time after stopping. There were no obstructions or conditions to keep plaintiff from seeing the train had he been driving a car with proper lights and at a careful and reasonable rate of speed and keeping a proper lookout, and it was due to plaintiff's fault and negligence that the accident occurred."
In the present case there are but two facts upon which it is contended that the case at bar comes under the exception to the general rule and those are the slight incline of approximately six inches to one hundred feet, which in all probability prevented the lights of the automobile from being wasted underneath the box car and caused them to cover a greater surface of the side of the red box car and, secondly, the "Peabody-Dimmick" formula, which is based solely upon the amount of railroad and motor vehicular traffic. Other than these two factors, the railroad company had the usual crossing warnings which were really unnecessary in the present case due to the fact that the three occupants of the car had just some 30 minutes previous to the accident crossed this track going to the night club where it is shown they had some wine and beer, and they were, therefore, familiar with the railroad crossing and its location, and utterly failed to stop or slow down or observe the warning of Muller to the effect that the train was blocking the crossing. Much is made of the fact of the testimony that Muller was a moron, however, he was of sufficient intelligence to be placed upon the stand and his testimony is apparently clear and intelligible. The District Court depended upon it to convict the driver and front seat passenger of contributory negligence upon their failure to see the train and to heed the warning given by Muller. The accident did not happen immediately upon Muller's warning as the car was traveling 50 or 60 miles an hour, and upon the warning given by Muller the driver then retorted something to the effect that he didn't need to teach him how to drive which, of course, took some time, possibly sufficient time to have saved his own life. Eliminating the *879 slight incline as an unusual condition leaves only a contention that because of the heavy traffic in trains and vehicles using and going over this crossing that such a fact rendered the crossing unusually hazardous. It is true that the greater volume of traffic that uses a crossing, it follows that the greater percentage of people will be injured or killed, but unless, in addition to the crossing itself, there are unusual conditions such as a fog or snow, which affect visibility or obstructs the view, the general rule applies and the general rule is that the railroad is not negligent in failing to supply a warning by way of flagman, brakeman or warning devices.
It is also to be noted that, as shown by the jurisprudence cited in order to charge the railroad company with negligence in leaving an unlighted train across the highway in the night, the employees in charge of the train must in the exercise of reasonable care have knowledge that on account of the particular facts or situation involved people traveling along the highway in automobiles properly equipped with lights and carefully operated at reasonable speeds would be likely to come into collision with the cars, unless such warning precautions are taken. In the present case, there are no particular facts or situation involved as revealed by the record by which the employees in charge of the train in question could have known that anyone would run into the train where the automobile was properly equipped with lights and being carefully operated at a reasonable speed. The automobile involved in this accident was properly equipped with lights but it was not being carefully operated at a reasonable speed under the facts and circumstances. There was no reason why this train should not have been observed by the occupants of the car and it was observed by one whose warning went unheeded.
Now let us examine a few of the cases in which the railroad was held guilty of negligence. In Martin v. Yazoo & M. R. Co., La.App. 2 Cir., 181 So. 571, 577, it was stated:
"The first questions to determine are the alleged negligences of the defendant company. The defendant's railroad traverses in an easterly and westerly direction the main part of the city of Monroe. From its passenger station to the bridge crossing the Ouachita river, there is a street crossing every block,five in all. The distance is approximately one-half a mile. The crossing where this accident occurred is a very dangerous one and, as alleged, is extremely hazardous. The engineer on duty at the time was asked if he knew there was a City ordinance limiting the speed of trains over this section of the city to 6 miles per hour, and he answered that he understood that to be the law. * * *
* * * * * *
"Regardless, however, of there being no specific law or ordinance fixing the speed limit of defendant's trains while operating in the city of Monroe, there is a duty upon the defendant not to run its trains at a speed which will endanger the lives of those who make use of the streets of the city. What is excessive speed must be determined by a consideration of the hazardous conditions existing at the crossing where the accident occurred. Natal v. Louisiana & A. Ry. Co., 18 La.App. 50, 137 So. 600. And when this is done, we are convinced a speed in excess of 6 miles per hour was excessive at this particular crossing, due to the obstructions, the nearness of the two crossings to each other at Grand and Walnut streets, and the lack of mechanical devices or sufficient flagmen to properly take care of the public at the two crossings. * * *
* * * * * *
"In the language of counsel for plaintiff, the allegations of negligence are as follows:

*880 "`That the said passenger train, leaving defendant's depot in Monroe at about 7 o'clock P.M., November 4, 1935, and traveling west about half a mile came to Walnut street of said city, "at a dangerous, excessive and illegal rate of speed;" * * * that the said collision occurred in the "center and heart of the business section and heavily traveled portion of the city of Monroe * * * at a time of day and night when noises from automobiles, trucks, newsboys, hotel criers and porters, steam whistles, radios, taxicab drivers and peddlers were all making great noise at and near the point where the said accident and collision occurred, sufficient to drown out and render of no use or service any whistle or ring of bell from the said train made at anytime before said train was practically in the act of striking the said truck."
"`That Walnut street and Grand street at DeSirard are 200 feet apart; that both, running north from that street a distance of about 150 yards, come to the defendant's railroad tracks; that in that distance they run slightly diagonal toward each other so that there is only about 40 feet between them immediately before they reach the said railroad tracks; that there are high brick buildings on either side of each of the said streets in said block extending to close proximity to the tracks; that there is a brick building 40 feet wide on its west and between said streets, and 30 feet high, immediately south of the said railroad tracks; that there was and is a brick building immediately south of the said crossing three stories high, abutting on the east side of Walnut street a width of fully 100 feet, the north wall of said brick building and the said west wall of same extending to within 20 feet of the said main line track of the said defendant upon which the said passenger train was traveling; that there is and was then a side track, being between this said last named brick building, the said side track extending to within a few feet of the west end of the said brick building, back east some three of four hundred yards, upon which side track there are constantly left box cars standing, some within 15 feet of said Walnut street, and sufficiently near to cut off the view to the east of a man operating a motor truck on Walnut street in approaching the said main line; that the said intersection is paved in and between each of the streets at said railroad crossing, a distance of over 100 feet north and south and 200 feet east and west; and that about 60 yards north of the said intersection, the two streets converge and become one.
"`That a very steep incline in the paving and grade of said Walnut street begins about 90 feet south of the said main line track and extends to within 15 feet of said main line track; and that said incline was so steep that it required either second or low gear of the said loaded truck to climb same.'
* * * * * *
"The physical conditions surrounding the crossing in the case at bar made it extraordinarily hazardous and it was the duty of defendant to maintain at said crossing `flagmen to warn the public using said crossing of the approach of the trains.' * * *"
It is self-evidence that the above case is not similar from a factual standpoint to the case under consideration. However, the cited case does not depart from the settled jurisprudence which recognizes the general rule and adheres to the settled jurisprudence with regard to the necessity for the existence of unusual facts and circumstances which can reasonably be charged to the knowledge of the employees of the railroad that under such unusual conditions or circumstances drivers might be expected *881 to collide with the stationary or moving train, which ever might be the case.
Hebert v. Texas & Pac. Ry. Co., 28 So.2d 151, 152, was another case decided by this court in which a passenger was allowed to recover. The facts and basis of the decision are shown by the following:
"On the question of personal liability, the trial judge states that he was left with no doubt in his mind from the testimony of the witnesses, that while the truck driver might have been guilty of contributory negligence, the deceased boy, who was riding on the rear of the truck, which truck was enclosed, could not conceivably be charged with direct or independent negligence. He states that the negligence of the railroad company consisted in its creating an extremely dangerous situation and thereafter taking no precautions against the occurrence of just such an accident; that McCall Crossing is subject to very heavy vehicle traffic during the cane season, to the knowledge of the railroad; and that on the morning of the accident freight cars were spotted on both the east and west sides of this crossing at a distance of less than 60 feet from the crossing, although the railroad witnesses testified that the closest freight car on the west side was 65 feet to 70 feet from the road. The trial judge calls attention to the fact that one of the railroad company brakemen admitted that it was the practice of the railroad for a brakeman to act as flagman if freight cars were spotted closer than 60 feet to a railroad crossing. The trial judge was convinced from the evidence that there was a failure to give a timely warning signal.
"In other words, we can find no error in the finding of fact of the trial judge that the railroad was guilty of gross negligence in spotting cars on this heavily travelled crossing, entirely for its own convenience, at a distance of from 40 feet to 45 feet thereof, without taking the precaution of having a flagman to warn approaching traffic of the dangerous situation existing, and that the engineer, well knowing that this was a heavily travelled crossing, and well knowing that these cars were spotted on both sides, was guilty of gross negligence in proceeding at a rapid pace, without stopping, or even slowing down, at said crossing, and as a result, crashing into the rear of the truck wherein the decedent was present."
In the last cited case we see that the railroad had spotted cars close to the crossing, thereby creating a dangerous situation to the knowledge of the engineer, and when he disregarded the existence of this obstruction to the view of the traveling public and proceeded at a rapid pace without stopping or even slowing down at the crossing, the court very properly found the railroad guilty of such negligence that a passenger in the rear of an enclosed truck could recover, although it did find the driver guilty of contributory negligence. This case is not apposite to the case at bar because of the difference in the facts. There was no obstruction, nothing unusual in the atmospheric conditions or weather or otherwise, in the case at bar, and we have nothing other than the fact that it was a heavily traveled highway which alone is not sufficient under the jurisprudence to convict the railroad of negligence.
Again in Arnold v. Illinois Central Railroad Company, La.App., 32 So.2d 76, 78, the railroad was held to be negligent and the passenger allowed recovery. The facts and conclusions of the court are as follows:
"* * * The principal question to determine is whether or not on account of the darkness and fog it was the duty of the railroad to take any extra precautions to protect traffic on the highway, other than the signs above mentioned.

*882 "The evidence shows that there was a heavy fog in the area of this crossing at the time of the accident, but the density of the fog and the extent of visibility varies in the testimony. Some of the witnesses testified that the fog was so dense that a person could see only a few feet, while others stated that, while there was a fog, it was not unusually heavy and visibility was not seriously impaired. The preponderance of the evidence shows that the darkness and fog seriously affected visibility and rendered driving an automobile rather hazardous.
* * * * * *
"The evidence in the present case shows that the fog was so dense that the driver of a car could not see more than 35 or 40 feet, and if we are to apply the reasoning employed in the Squyres case, it was the duty of the railroad to protect the crossing by having a flagman stationed there with a lantern to warn approaching traffic while the crossing was being blocked by the train, or at least provide some warning signal more than the signs which it was difficult for a motorist to see. The railroad employees knew this crossing to be used frequently as it is on one of the main thoroughfares of the State. They also knew that the fog was heavy and visibility poor, but seem to have remained content to stay in their respective places in the engine and caboose while their train was blocking the highway a quarter of a mile away for at least a few minutes probably two or three minutesduring which time they should have reasonably expected several automobiles and trucks to approach the crossing."
The unusual circumstance in the Arnold case was a heavy fog which seriously affected visibility, knowledge of which was, of course, chargeable to the employees of the railroad company. In this particular case as well as in a great many of the other cases involved with similar kinds of accidents, they occurred at a crossing on a heavily traveled highway. The court comments upon this fact for the reason that on these heavily traveled highways, if a crossing is blocked two, three or five minutes, the train crew is bound to realize and is charged with the knowledge that there will be some traffic over these heavily traveled routes, and on such highways the likelihood of an accident is greatly increased because of that fact and where, in addition, visibility on account of fog, snow, sleet, rain or obstructions which hide the oncoming or stationary train. However, there is no case which has held that a railroad was negligent because of the fact that a highway is heavily traveled. There must be in addition unusual circumstances as shown by the many cases cited.
There were no unusual facts or circumstances shown in the present case by which it could be decided under the exception to the general rule, and therefore there was no negligence on the part of the railroad company and the sole and proximate cause of the accident, deaths and injuries resulting therefrom was the negligence of Harris, the driver of the automobile.
For the above and foregoing reasons the judgment of the District Court is reversed, set aside and annulled and the plaintiff's suit dismissed at his cost.
TATE, Judge (dissenting).
With due respect to my able and esteemed brethren, they have confected a thoroughly unrealistic majority opinion which not only does great individual injustice to the dead and mangled automobile passengers of the present lawsuit, but also virtually licenses the defendant railroad to continue to maintain a death trap at the railroad crossing in question without any duty whatsoever to lessen such great hazard to the public.
The majority agrees that the railroad was negligent in not providing additional warnings if the railroad crossing was exceptionally *883 hazardous. A bare statement of the essential facts indicates how bookish and unrealistic is the majority's finding that such was not the case:
Because of numerous serious accidents (including at least one previous fatality) at this same intersection, a civic club had just seven weeks before the accident by public resolution called upon defendant railroad "to install proper lighted traffic signals and control devices" at this same crossing because of the "imminent danger" thereat, which "such imminent danger is considerably increased and greater during the hours of darkness, because no lighted signals are there placed, and further because the immediate vicinity and area surrounding the intersection have no lights of any sort which make a train or freight car on the track visible to motorists." (P-20.)[1]
The Lake Charles Association of Commerce endorsed this resolution and forwarded it to defendant railroad just nineteen days before the horrible accident herein, and defendant railroad acknowledged receipt of this protest of the alarmed citizenry on October 9, 1951, just fifteen days before the accident.
Despite this notice, the railroad employees (charged with notice of these protests as to an exceptionally dangerous crossing) saw fit to leave an unlighted dark train stretched across this unlighted intersection for in excess of five minutes, in the pitch blackness of night. As the District Court commented, due to the fact that the freight car wheels were on both sides of the highway (and not on the highway itself) and there was a slight rise in the highway, together with the blackness of the asphalt pavement, it could be expected that automobile lights on "dim" in the city traffic to be reasonably expected would shine under the railroad car in question and would not outline or pick out same to the reasonably prudent motorist, entitled to expect that the highway ahead would not be blocked with such gross negligence and complete lack of care as to the possible dangerous consequences to oncoming traffic.
The management of this company had not seen fit to make any regulations concerning giving notice to traffic, so that two or three employees with lighted lanterns casually conversed two or three hundred feet away from the crossing, although the use as warning devices of these easily available lanterns might have lessened the danger to oncoming traffic. And the railroad company itself had on May 11, 1951, six months before the accident, acknowledged that the present was a "hazardous grade crossing" which required installation of flashing light signals at a cost of $4,500 to provide the desired protectionalthough it had not yet installed same at the time of the accident, since it had been unable as of that time to secure governmental contribution toward construction of this much-needed warning device.[2]
With due deference to my learned brethren of the majority, I think it is clear that under the facts of this case by the standard of reasonably prudent men the railroad failed to show ordinary care towards oncoming traffic, and consequently was negligent in the premises. (Certainly the District Court's determination that such was the case, was not manifestly erroneous.) We sometimes forget that the standard to be applied under the facts of each case is that of the ordinary care to be expected of reasonably prudent human beings, not of legal scholars who *884 may sometimes deduce higher or lower standards from decisions based on differing facts.
I submit that it does not take a lawyer or a judge to determine what any laymen with ordinary perception would at once perceivethat this particular railroad crossing, as blocked by the almost invisible railroad car in the pitch blackness of midnight, created an extraordinary hazard to oncoming traffic and that defendant railroad (particularly in view of the civic protests) was charged with knowledge of this, but failed to take the slightest precaution to prevent an easily foreseeable accident.
The chief legal fallacy in the majority opinion is that it fails to distinguish between the primary negligence of the railroad in failing to provide adequate warning at this unlighted intersection, and the contributory negligence of the automobile driver in failing to see a railroad freight car blocking the crossing.
For instance, the District Court felt that "the driver of a vehicle along this highway might reasonably be expected to drive with the beams of his headlights deflected" downward on dim, which unquestionably would cause the beams to shine underneath the freight car and fail to outline to the driver this obstruction on the highway. The majority opinion quotes this finding of the District Court, then concludes that it "might be just as reasonable or logical to conclude" that plaintiff's driver's lights were on bright.
The majority's deduction as to this particular driver may be so, although I strongly doubt it, as will be explained below.
But the principal point is, irrespective of any contributory negligence on the part of the present driver, that the railroad could reasonably expect ordinary traffic to drive with lights on dim, so as not to be able to perceive the parked freightcarand that the railroad company was therefore primarily negligent in failing to provide additional warnings to motorists of this extremely hazardous situation. Whether or not the individual plaintiffs' recovery is barred by their particular contributory negligence is of course another question.
The District Court properly, in determining the railroad's duty to oncoming traffic, tested it by its general duty to all such traffic which might reasonably be expected to use this highway; the District Court properly found a gross breach of this duty of ordinary care to oncoming traffic under the circumstances of this case.
The majority avoids holding defendant railroad negligent simply by saying that the burden of proof was on this particular plaintiff driver to prove that his own lights were on dim rather than bright; unintentionally, the majority put the burden of proof on plaintiff to prove himself free from contributory negligence, rather than the burden of proof on defendant railroad to prove plaintiff's driver guilty of contributory negligence barring recovery. This is of course an extremely important burden, since the driver is the only person who might testify as to this important fact, and his lips are stopped by death. (And the majority overlooks that even though the driver might be contributorily negligent because of failing to see the railroad car negligently blocking the highway, his passengers may be free of contributory negligence barring their recovery.)
In the majority opinion several times it is noted that the freightcar was "red". While perhaps in daylight this might have been a significant factor, it is respectfully submitted that in the pitch blackness of the midnight when this fatal accident occurred, whether the freightcar was the bright crimson red connoted by the reiteration of this description or was the dull dark red usually seen on freightcars or instead was of the blackness of india ink, it was equally indistinguishable to the naked eye of oncoming motorists under the circumstances of this case.
*885 Much as I dislike to burden this already overlong dissent with a detailed discussion of the facts and the law, I feel duty-bound to do so, in order to assist any reviewing court and also both counsel by demonstrating the differences of the appreciations of fact and of the law which have led the majority to one result, and which led the District Court and myself to the contrary decision.
Perhaps even more harmful than the individual injustices which will result if the present majority opinion stands is the lessening of the duty owed by railroads at crossings to automobile traffic which has at least an equal right to use the highways as the obstructing railroad trains. For if the present majority opinion stands, railroad companies may well be on notice that they owe no duty whatsoever to motor vehicular traffic not to block the highways without warning (unless perhaps there is rain or fog). In the present case, for instance, the railroad would have done well from an economic, although of course not a humanitarian standpointif it failed to install the flashing light signals for $4,500, no matter how many lost lives or crippling injuries such warning signals may reasonably be expected to prevent.

A. Negligence of Defendant Railroad.
As noted above, the issue herein (as to which both parties agree) is whether the railroad crossing in question was so unusually hazardous at the time of the accident that the railroad's failure to use warning precautions (such as flares or fusees or a luminous flasher-light or a flagman with a torch) additional to the unlighted routine warning signs provided by statute, constituted negligence which proximately caused or contributed to any accident with oncoming motor vehicular traffic. Should such negligence be found to be a proximate cause of the accident herein, then it is necessary to decide whether contributory negligence on the part of any or all of plaintiffs defeats recovery.
Defendant railroad vigorously assails the District Court judgment as arrived at erroneously in the following respects: (1) its admission of and reliance upon the testimony of Professor Flanakin relating to application of the Peabody-Dimmick formula as evidence that the railroad crossing in question was extremely hazardous; (2) its admission of and reliance upon certain civic club resolutions and letters to and from defendant railroad to show that it had notice before the accident in question that the railroad crossing in question was extremely hazardous; and (3) its holding the railroad crossing herein hazardous in view of the testimony that there was no unusual obstruction to the view, nor any fog or other weather condition affecting visibility. As to the latter point, it is defendant railroad's view that "the presence of a railroad train occupying the crossing of an ordinary highway is, alone, a sufficient warning of dangerirrespective of other warning protection, and is notice that the highway is temporarily closed; and the travelers upon the highway who crash into it may not recover damages for injury from the railroad, because (1) their own negligence is the proximate cause; (2) they are negligent as a matter of law, which constitutes contributory negligence and bars recovery." (Pp. 3-4, defendant's brief.)
This dissent will discuss these contentions in the order stated.
(1) Peabody-Dimmick formula.
Introduced on behalf of plaintiffs is the testimony of H. A. (Mike) Flanakin, Highway Engineer for the American Trucking Associations, Inc., in Washington, D. C., and on leave at time his deposition was taken by written interrogatories, from his post as Associate Professor of Highway Engineering at Louisiana State University.
Professor Flanakin's testimony, based both on personal study of the railroad crossing in question, and also upon application of the Peabody-Dimmick mathematical *886 formula, was to the effect that the railroad crossing with which we are concerned was extremely hazardous.
This mathematical formula is used by the United States Bureau of Public Roads (and has been so used for almost 20 years) and by the highway departments of all States as basis of determining the relative hazard of railroad crossings for purposes of determining priority of allocation of federal funds as available in elimination of, first, the most hazardous of such crossings as determined both by application of the formula and also by observation of local conditions surrounding the crossing in question. This formula was derived by collation and analysis in accordance with principles of statistical mathematics of the factors involved in an extremely large number (3563) of car-train railroad crossing accidents. In derivation of the formula, eventually eliminated were all but three factors: (a) amount of railroad traffic over the crossing; (b) amount of motor vehicular traffic over said crossing; and (c) type of warning protection, such as unlighted signs, lighted signs, warning gates, flagmen, etc.
Certain coefficients were derived for each type of warning protection, which when used in the formula in connection with the two other factors involved (railroad and motor traffic respectively), enabled them to measure the accident expectancy rate of the crossings studied and, theoretically, to apply these coefficients and the formula prospectively as to any railroad crossing so as to predict the accident expectancy rate at that crossingthat is, with the protection device actually in use at the crossing, how many accidents would occur over a period of five years; and also how much this accident expectancy rate could be reduced by providing a type of warning protection with a higher coefficient.
The derived coefficients of the types of protection showing the relative usefulness of same for purposes of the formula in preventing railroad accidents at crossings are as follows, (Tr. 157):

"Type of protection Coefficient
Signs 19
Bells 29
Wig-wag 56
Wig-wag and bells 63
Flashing lights 96
Flashing lights and bells 114
Wig-wag and flashing lights 121
Wig-wag, flashing lights and bells 147
Watchman, 8 hours 119
Watchman, 16 hours 180
Watchman, 24 hours 228
Gates, 24 hours 241
Gates, automatic 333"

It is admitted that the formula does not attempt to correlate the effect of certain other factors, such as drunken driving or obstructions to the view, which may contribute to crossing accidents. These various local factors were arbitrarily eliminated when the authors of the formula were unable mathematically to determine their effect due to nonuniform or incomplete reporting as to these factors, and the infinite variations such factors might take. It is further admitted that the accuracy of the prospective application of the formula to predict accidents has never been tested due to lack of funds.[3]
Because of these admissions, and because the authors of the formula testified that they did not believe application of the formula could be the sole determinant of whether a particular railroad crossing's lack of protection constituted negligence in a damage suit, or the measure of the legal duty of the railroad to furnish additional warning protection at a given highway crossing, defendant urges most strongly *887 that the District Court committed error in admitting or considering testimony based upon same.
However, defendant overlooks that the District Court admitted the testimony and considered it together with the evidence as to other factors, and also overlooks, that the formula's authors admitted that use of the formula might contribute or have some value in determination of whether or not a given railroad crossing was hazardous, see Tr. 394, 396, 415.
For instance, Mr. Peabody testified as follows, Tr. 414-415:
"Q. Do you feel that a person who has a good knowledge of it [i. e., the Peabody-Dimmick formula], that has a knowledge of the local conditions, could establish fairly accurately the hazardous nature of the crossing? A. I think it would be of assistance to him, yes. I think it would be, but I don't think it would be a sole means."
It is certainly useful as evidence concerning the "relative hazard" of the crossing as compared with a norm which is admittedly arbitrary (accident expectancy rate of 5 or less), together with other factors considered by the District Court, to determine whether the crossing is more than usually hazardous.
Professor Flanakin testified, based upon certain statistics as to train and motor vehicular traffic furnished by the Missouri-Pacific Railroad to the Louisiana Department of Highways, that the accident expectancy rate of the intersection concerned was 13.67, i. e., that 13.67 serious accidents could be expected in a period of five years. Professor Flanakin testified that railroad crossings with accident expectancy rates of 5 or more are considered hazardous and in need of additional protection, and are considered "extremely hazardous" when defined with an accident expectancy rate of 8 or more (Tr. 162). Based upon personal observation of the railroad crossing in question, as well as application of Peabody-Dimmick formula, Professor Flanakin testified that said crossing was "extremely hazardous", and that to protect the public and reduce the extraordinary hazards the crossing should be lighted, that additional protection should be furnished by flashing lights, and that further a flagman with a red light or lantern similar to those used by the state police should be used in directing and controlling traffic at the intersection in question.
Defendant urges with considerable force that although such formula might indicate for theoretical purposes based upon amount of traffic that additional protection was needed, nevertheless it is not relevant to determine whether or not in the case of any particular accident the railroad company was negligent. Thus, in short, when an automobile runs into a train at an intersection, whether the volume of traffic is light or great, insofar as that particular car and train are concerned, only the conditions at the time of the accident are relevant, since that particular accident may have occurred irrespective of the amount of railroad and motor vehicular traffic over the intersection in question.
This is a logical argument, but it overlooks that the test of the duty, breach of which is negligence, is the reasonable expectation whether or not observance of such duty will reasonably prevent harm to others acting also as normally prudent persons. As the late Mr. Justice Cardozo stated, "The risk reasonably to be perceived defines the duty to be obeyed," Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 100, 59 A.L.R. 1253 at 1256. It is indeed hornbook law that "the standard upon which the law of negligence is based is determined by weighing the magnitude of the risk of harm against the utility of the actor's conduct", Prosser, Torts (1941) 220, and that the test of what is reasonable conduct varies with the situation and by what harm to others may reasonably be foreseen by the acts or omissions in question, Prosser, Torts (1941) 181, 221, 226, *888 342. See excellent Comment, McDonald, "Proximate Cause in Louisiana", 16 La. Law Review 391. Possibly one may leave an open vat of cyanide poison in a cow pasture without being negligent; but leaving the same vat in the playground of a kindergarten might constitute gross negligence rendering the doer liable to the parents of the children killed as a result of the act. The harm that others may suffer is reasonably foreseeable in the latter instance, as it may not be in the former. See Saxton v. Plum Orchards, Inc., 215 La. 378, 40 So.2d 791.
Thus, while a railroad may not be negligent to leave unguarded a crossing with a deserted country lane ending in a dead end, perhaps the same omission might constitute negligence as to a crossing with a heavy volume of rail and motor traffic. For instance, in Hebert v. Texas & Pacific Railway Company, La.App. 1 Cir., 28 So.2d 151, certain conduct of a railroad was held by us to be negligent at "a heavily travelled crossing" which might not have been so considered at a less traveled crossing. See also Arnold v. Illinois Central Railroad, La. App. 1 Cir., 32 So.2d 76, Martin v. Yazoo & M. R. Co., La.App., 181 So. 571, where the busyness of the intersection was a factor in holding the railroad liable for failure to afford additional warning protection.
(2) Admission of testimony showing defendant's notice of the crossing's extreme hazard.
Defendant objects violently to the admission and consideration given certain documentary evidencecivic club resolutions and letters, letters to and from defendant, concerning the crossing involved in the accident herein. These all originated and were dated before this accident. Defendant misapprehends the purpose of their admission when it argues that such were admitted to prove in themselves that the crossing was hazardous. They were correctly admitted as showing that the defendant railroad had notice that the crossing involved was hazardous, in conjunction with the other testimony proving that the crossing indeed was extraordinarily hazardous. See Annotation, "Extrajudicial declaration * * * admissible * * * for purpose of showing knowledge of * * * condition at or prior to time of injury," 141 A.L.R. 704.
For instance, on September 5, 1951, just seven weeks before the date (October 24, 1951) of the present accident, the Exchange Club of Lake Charles, a civic organization, passed the following resolution (P-23):

"Resolution
"Whereas, we, the members of the Exchange Club of Lake Charles, being aware and taking full cognizance of the imminent danger existing at the intersection of the Louisiana State Highway designated Number 42, and the Missouri Pacific Railroad, which intersection lies on the Southern Corporation Limits of the City of Lake Charles, in the Eastern area of said Lake Charles, to the vehicular traffic flowing along Highway 42 and across the Missouri Pacific track; and
"Whereas, such imminent danger is considerably increased and greater during the hours of darkness, because no lighted signals are there placed, and further because the immediate vicinity and area surrounding the intersection have no lights of any sort which make a train or freight car or the track visible to motorists, and
"Whereas, we recalling a most recent near fatal accident occurring at the intersection, and further recalling other traffic accidents occurring at that intersection in the past, including at least one fatal traffic accident, make this our resolution, to-wit:
"Be It Resolved, that we, the members of the Exchange Club of Lake Charles, in regular meeting duly assembled, do hereby recommend to and strongly implore of the Traffic and Safety Committee of the Association *889 of Commerce of Lake Charles, and of the Board of Directors of the said Association of Commerce, that proper action be taken by these bodies to further, on the basis of this Resolution and the existing need, recommend and implore of the City of Lake Charles, the State of Louisiana, and the Missouri Pacific Railroad, to install proper lighted traffic signals and central devices at the said intersection in order to forewarn and make visible to our motorists the imminent danger of the intersecting railroad." (Italics mine.)
In due course, this resolution was endorsed by the Lake Charles Association of Commerce, which by letter of October 5, 1951 (P-22), notified defendant, as well as various governmental bodies, of action, receipt of which letter was acknowledged by defendant railroad on October 9, 1951 (P-29), just fifteen days before the accident herein.
Furthermore, the following self-explanatory letter was transmitted by defendant to the Louisiana Department of Highways over five months before the present accident, indicating that defendant itself felt the need of additional protection at this highway crossing:
 "Guy A. Thompson, Trustee
 Missouri Pacific Lines
 MM-56100-La.
 St. Louis 3, Mo.
 May 11, 1951
"Mr. J. A. Kinkead
Project Control Engineer
Department of Highways
Baton Rouge, Louisiana
"Dear Mr. Kinkead:
"Our attention has been called to a hazardous grade crossing of State Highway Route 42 over Missouri Pacific main and yard tracks east of roundhouse and yard facilities at Lake Charles.
"In our investigation of the need of crossing protection at this location it developed that there have been three serious accidents on this crossing where vehicles ran into the side of train. Route 42 is a straight north and south black top highway, crossing the main track at about 90 degree angle, while a yard track crosses this highway at an angle of about 21 degrees. The accidents that have happened have been mostly when there were heavy fogs which roll in from the Gulf at night.
"A traffic count over this crossing was made between 8:00 A.M. January 9 and 8:00 A.M. January 10, 1951 (a 24-hour period) resulting in the following:
 125 train or engine movements
 838 automobiles
 363 trucks
"This crossing is at the entrance to yard tracks at Lake Charles and is used as a switching lead. It also lies between both legs of wye track and there are several moves made around the wye tracks daily.
"The maximum speed of first class trains is 59 mph. Under City ordinance it is not lawful to blow or sound whistles within the corporate limits of the city.
"Attached is one copy of plan D-160 dated 3-5-51, showing the highway with respect to tracks and industries in the vicinity of crossing.
"It is our thought that flashing light signals, with time cutouts, would provide the protection desired at this crossing, roughly estimated to cost $4500.
"It would be appreciated if you will give consideration to programming protection at this crossing with Federal Aid on the usual 90-10 percentage basis, advising.
 "Yours very truly,
 /s/ W. H. Hobbs"
3. Law concerning factors by reason of which a railroad crossing is unusually hazardous so as to require a railroad to afford additional warning protection to the public, or failure to do which in a particular instance constitutes contributory negligence which is a proximate cause of the accident.
Probably the leading case concerning the duty of a railroad company to furnish additional protection at a highway crossing is Squyres v. Baldwin, 191 La. 249, 185 So. 14, *890 in which the organ of the court was Mr. (now Chief) Justice Fournet. In this case where a car crashed into a train slowly moving (at 4 mph) across a main highway, the passenger was allowed recovery because the railroad had not afforded additional protection to the crossing. The low gravel cars blended into the background, and snow obscured the vision of driver and passenger.
The following emphasized portions of authorities quoted therein are especially pertinent here:
"`There is, however, authority for the view that conditions may be such as to require a warning where, in the darkness, a car obstructs a crossing,'" 185 So. 14, 17. "`The atmospheric conditions, obscurity, and darkness of the crossing, the length of time it is obstructed, and the nature of the highway, may require that warning be given if the company is to be found in the exercise of due care,'" (Italics mine.) 185 So. at page 17. "`It is not a case of failure or neglect to see that which was visible, but of inability to see what was in fact an obstructed, but appeared to be an open, roadway,'" 185 So. at page 18.
See, for case allowing passengers recovery due to railroad's failure to afford additional warning protection, Arnold v. Illinois Central R. Co., La.App. 1 Cir., 32 So.2d 76, Hebert v. Texas & Pac. Ry. Co., La.App. 1 Cir., 28 So.2d 151, Martin v. Yazoo & M. R. Co., La.App., 181 So. 571.
Although the Squyres decision indicates that poor visibility because of atmospheric conditions is just one of the several factors from which a railroad's duty may arise to afford additional protection at a highway crossing, defendant urges and the majority herein held that this and several other cases cited hold that such duty arises only when the visibility is obscured either by weather or some obstruction of the view of the crossing.
It appears to me that the decisions hold that the duty to afford additional warning protection to the public arises not only when oncoming automotive traffic may be unable to perceive train traffic for such reasons, but also when it is reasonable to expect oncoming traffic to be unable to do so for such reasons as were found by the District Court to exist in the present case, where oncoming motorists were not alerted to the presence of a train in the darkness ahead due to the unlighted crossing, the slight incline together with the reasonable expectation that city traffic being involved automobiles would travel with lights on dim so as to shine underneath the railroad car standing parked with wheels not in but on either side of the highway, the length of time the unlighted train blocked the crossing parked and not moving, the blacktop road surface reflecting little light, the large amount of traffic to be expected on this heavily traveled thoroughfare (the main approach to the bustling city of Lake Charles from the south, or from the air base and Cameron);[4] and taking into consideration the railroad's knowledge that the crossing in question was hazardous and needed additional warning protection.
Cases cited in which the railroad was held not negligent in failing to furnish additional warning protection, such as Leger v. Texas & Pacific Ry. Co., La.App. 1 Cir., 67 So.2d 775, Smith v. Texas & N. O. R. Co., La. App., 70 So.2d 175, Domite v. Thompson, La.App., 9 So.2d 55, Eggleston v. Louisiana & A. Ry. Co., La.App., 192 So. 774, Aaron v. Martin, 188 La. 371, 177 So. 242, can be distinguished because the need for warning additional to that furnished in each particular *891 case did not arise because the locomotive bells were ringing or whistle was blowing, or the crossing was lighted by a fusee or engine light or otherwise, or the train was moving, or because no especial highway circumstances existed as herein which might prevent the automobile headlamps from showing the outline of the train. Unlike in those cases, the presence of the train across the highway herein was not calculated to attract serious attention from oncoming motorists.
Under the circumstances of this accident, the negligence of the defendant in failing to furnish additional protection at this hazardous crossing was a proximate cause of this accident. Had one of defendant's trainmen with lantern (three of whom were west of the track off the highway, from 200-500 feet from the crossing) been stationed on the highway with torch signalling toward oncoming traffichad defendant set out a fusee or flare to light and outline the parked train to oncoming traffichad defendant installed at the time of the accident the lighted flashing warning signal 500 feet south of the intersection, which was installed two months after this accidentoncoming motorists would receive some warning that in the darkness ahead, not readily perceivable by oncoming traffic, a train across the highway obstructed the motorist's passage. Without such warning, even a motorist more careful and proceeding more slowly than the driver herein would not be alerted to beware of the train on "`what was in fact an obstructed, but appeared to be an open, roadway'" in front of him, Squyres v. Baldwin, 191 La. 249, 185 So. 14 at page 18 (Italics mine).

B. Contributory Negligence of Plaintiff Muller and Two Decedents.
The alleged contributory negligence of Sam Muller, rear seat passenger and plaintiff in the present suit; that of Burwick Harris, driver killed in the wreck, and plaintiff's decedent in companion suit, 91 So.2d 897; and that of Joseph Sinegal, Jr., front seat passenger, also killed in the wreck, and plaintiff's decedent in companion suit, 91 So.2d 897; each present different legal questions. The District Court absolved present plaintiff of contributory negligence, but held that recovery on behalf of the driver and front seat passenger were barred by their respective contributory negligences.
The contributory negligence of each will be separately discussed below.
(1) Contributory negligence of Sam Muller, injured rear seat passenger.
Plaintiff Muller, sole surviving occupant of the car (whose testimony as shown below is completely incompetent), testified that he was laying down in the backseat as the car approached the crossing, but as he raised up to put the window down, he saw the "car boxes" standing across the road and yelled to the driver to slow down. The latter, he said, told him that he (Muller) could not teach him (Harris) to drive, immediately following which the accident occurred. Because under cross-examination Muller testified that he told Harris 3 or 4 times to slow down and estimated that he saw the train when one-half mile from the crossing (on redirect, he estimated that one-half mile was three blocks), defendant urges that any negligence of the railroad company in this regard could not be proximate contributory negligence because this passenger's testimony indicates the blocking of the crossing was plainly visible to a motorist sufficient distance away to enable the latter to draw to a stop.
However, the medical testimony unanimously indicates that at the time of trial Muller was of moronic mental capacity (whether as a result of mental deterioration resulting from injuries sustained in the accident is a substantial question of this suit), and defendant's expert psychiatrist himself admitted that Muller couldn't tell the difference between a horse and a cow, or between a fly and a butterfly inside of *892 40 seconds.[5] Muller's testimony concerning the accident of October, 1951, was taken in April, 1953, or almost 18 months after the accident, and the great preponderance of the medical testimony indicates that Muller was mentally deficient in ability to recall and was mentally irresponsible.[6]
Especially in view of Muller's admitted mental deficiencies, neither the District Court nor myself is able to hold as responsible Muller's estimates of the distance the car was from the train when he saw the boxcar parked across the highway. The physical facts indicate it must have been almost simultaneous with the collision, as there were no brakemarks on the highway and a trainman who saw the car before and at the accident testified that it did not slacken speed (testimony of Harris, Tr. 1187). We would have to presume a desperate suicidal intention on the part of the automobile driver, contrary to the vast probability and almost to the possibility of human nature, to hold that despite warnings one-half mile away, or even 900 feet away, the driver continued without slackening at a speed of 50-60 mph broadside into a train plainly visible across his path. (No doubt, in retrospect, much longer to an occupant of the car would seem these few split seconds and that short distance when the danger was being realized and at the end of which death would claim two of the occupants of the car, and almost claim the third.)
Based upon the presence of a wine bottle cap in the car (D-17), defendant urges that all three boys were on a wild drinking spree. The sole testimony in the record is that the boys had a bottle of beer apiece *893 (Tr. 674) and between the two passengers a half a pint of wine (Tr. 668). The accident occurred at about 11:30 P.M., and the owner of the car (which was borrowed without his consent) testified that he had parked it prior to its use by the boys between 11:00 and 11:15 (Tr. 1150), and Muller further testified they did not go into the car until after their work as porters at the Palace Theatre ended at about 11:00 P.M. (Tr. 617, 662.) This testimony tends to disprove rather than bear defendant's burden of proving by a preponderance of the evidence any contributory negligence in this respect.
I think there should be little difficulty in affirming the District Court's finding that Sam Muller, plaintiff herein, was free from contributory negligence. Until immediately prior to accident, according to all available evidence, he was lying down in the rear seat, and such a passenger is absolved from contributory negligence, having "no opportunity of in any manner exercising any control or supervision of the truck," Hebert v. Texas & Pac. Ry. Co., La.App. 1 Cir., 28 So.2d 151. If lying down in the rear seat, he was under no duty to perceive any danger, White v. State Farm Mutual Automobile Insurance Company, 222 La. 994, 64 So.2d 245, 42 A.L.R.2d 388; McDowell v. National Surety Corporation, La.App., 1 Cir., 68 So.2d 189, and immediately upon rising and perceiving the danger, according to the only available testimony, he shouted a warning to the driver. As the District Court held, if so, this "was all he reasonably could be expected to do under the circumstances, and thus he was not contributorily negligent." (Tr. 117.)
Defendant has not borne its burden of proving contributory negligence as to Muller.
(2) Contributory negligence of Joseph Sinegal, Jr., front seat passenger killed in the wreck.
The able District Court dismissed the claim arising out of the death of Joseph Sinegal, Jr., front seat passenger, in the following holding, Tr. 116:
"The evidence also establishes that Joseph Sinegal, Jr., who was in the front seat immediately to the right of the driver, voiced no protest and made no effort to warn Burwick Harris of the danger or to persuade him to exercise caution. Although he may not have seen the train, and the Court is convinced that it was difficult to do so, his attention was called to the fact that it occupied the crossing by Muller, one of the other occupants of the car. As a guest or passenger in the automobile, it was his duty to warn the driver of the danger and otherwise exercise ordinary care to protect himself. His neglect to do so constituted a contributory or proximate cause of the accident."
Plaintiff-appellant points out, correctly in my opinion, that even had decedent Sinegal also shouted a warning, it would have served no purpose, as the car was too close to avoid colliding with the train previously obscured in the darkness ahead. While perhaps by exceptional straining or attention the train might have been perceived a little earlier than it actually was, nevertheless it does not appear that it could reasonably have been perceived under the conditions of this particular crossing in time to have avoided this particular accident; and even though the driver's lack of lookout might have somewhat contributed to the accident, the duty of even a front seat passenger is not as great as that of the driver with regard to lookout.
Our Supreme Court has recently redefined and clarified the duty of a passenger with regard to operation of a car in the cases of Herget v. Saucier, 223 La. 938, 67 So.2d 543 and White v. State Farm Mutual Automobile Insurance Company, 222 La. 994, 64 So.2d 245, 42 A.L.R.2d 338. "Contributory negligence is, as its phrase signifies, negligence which contributes to the accident, that is, negligence having causal *894 connection with it and but for which the accident would not have occurred. Insofar as the rights of a guest in an automobile are concerned, it is well settled that in actions against third persons, the guest riding in an automobile has the right to rely to a reasonable extent on the care and proper operation of the car by the driver. The guest is not called upon to be on the same alert and to have seen what the driver should have seen. It is only when there is danger so apparent that he, as well as the driver, should have seen it that he becomes negligent also if he fails to give warning or to protest if the driver's negligence continues. Churchill v. Texas & Pac. Ry. Co., 151 La. 726, 92 So. 314; Lorance v. Smith, 173 La. 883, 138 So. 871; Delaune v. Breaux, 174 La. 43, 139 So. 753; White v. State Farm Mutual Auto Ins. Co., 222 La. 994, 64 So.2d 245, 42 A.L.R.2d 338; Herget v. Saucier, 223 La. 938, 67 So.2d 543," Vowell v. Manufacturers Casualty Insurance Co., 229 La. 798, 86 So.2d 909 at page 914.
"[A] guest is under no duty to supervise the driving of the vehicle and he is not obliged to look out for sudden or unexpected dangers that may arise. Albeit, he * * * `is not required to monitor the operation or to pay attention to the road and other traffic conditions' in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle," White v. State Farm Mutual Automobile Insurance Company, 222 La. 994, 64 So.2d 245 at page 249, 42 A.L.R.2d 338.
The presence of the train on the highway was undoubtedly a "sudden and unexpected danger". Although the car had passed northward over the railroad crossing about 30 minutes earlier when same was unoccupied, particularly as to the passenger there was no duty to be so impressed with the existence of an empty crossing as to anticipate that it might be obstructed absolutely without warning (although this was a much-travelled thoroughfare) on the return. It might be added that so far as this record indicates, this is the first time these boys had ever driven on the road in question. As previously observed, the sudden danger was apparently perceived almost simultaneously with the crash, so that even if the guest perceived it or had the opportunity to shout a warning, such warning could not be effective.
While possibly even although Sinegal, decedent herein, did not have the duty to observe the train in its path, he might have been negligent if he had the opportunity to do so in time to have warned the unobservant driver and prevented the accident; the record is bare as to proof of this. And the physical facts of the accident and the crossing indicate, rather, that no occupant of the car had the opportunity to do so.
It is incumbent upon the party pleading contributory negligence to prove it by a preponderance of the evidence, Stansbury v. Mayor etc. of Morgan City, 228 La. 880, 84 So.2d 445.
Counsel for defendant implied in several questions (Tr. 676, 681) that the sole survivor (Muller) had in the hospital following the accident given a statement to a railroad claim agent to the effect that he, Muller, was laying down in the rear seat when he heard the driver, Harris, and front passenger, Sinegal, Jr., discuss beating the train to the crossing just immediately before the accident; and he, Muller, alarmed, had risen to warn them as the car struck the train. However likely this may be as an explanation of the accidenttaking into consideration the almost invisible nature of the obstructing train and that the locomotive backing which (2,000 ft. east of the intersection, its front facing away from the crossing) had given the back-up whistle blast just a second or so before the crash, and that the driver might thus have thought it was approaching the crossing frontwards there is no proof that this correctly reconstructs the accident, since the unsworn *895 questions of counsel cannot be considered as evidence.
Further, Muller denied giving such statement, and it was not introduced into evidence; and, even if introduced, it is unlikely that it could have been considered as proof of the facts therein contained, but only as a prior contradictory statement reflecting on the credibility of Muller, since it is certainly not an admission against Muller's own interest and does not seem to fall within the exceptions to the hearsay rules against the other plaintiffs.
The difficulty in resolving the issue of contributory negligence herein is that the chief relevant evidence thereof would be the testimony of the occupants of the automobile, of whom two are dead, and the third is mentally incapacitated to give responsible testimony.
It seems unfair to defendant railroad that such possible proof of its defense is unavailable; but it would be unfair also to penalize the claimant standing in the shoes of the dead boy, whose mouth death has stopped from testifying whether or not he was free of contributory negligence. The burden of proving contributory negligence is on the defendant, and this burden cannot be satisfied by assumptions not founded upon sworn testimony in the record.
The remaining ground upon which Sinegal might be found contributorily negligent is if he permitted without protest Harris to drive so negligently or at such speed as might be reasonably supposed to endanger the safety of the occupants of the car or others.
Muller testified to a speed of 50 mph, defendant's witnesses examined the speedometer in the wrecked car and found it frozen at 60 mph (which of course is not conclusive as to such speed, as it might have been greater or less than that registered upon said speedometer, if same was not accurate), and the District Court found a speed of between 50-60 mph at the time of the impact. We believe this finding reasonably supported by the record. The results of impact of the car striking with full force headon the side of the train demolished the car and did certain damage to the freightcar, but the record does not reveal these to be inconsistent with a speed of 50-60 mph.
Defendant urges that the car must have been proceeding at a speed greatly in excess of the legal limit because the 23-ton empty boxcar struck by the automobile was found derailed after the accident. It might be a legitimate deduction, except that the record reveals that the automobile was dragged by the train 18 feet west following the accident (see Tr. 1202-3, 1280), and reveals without contradiction that the markings made by the derailed railroad wheels were only from 4-7 feet in length (Tr. 1283), indicating of course that the freight car was not derailed until 11-14 feet after the impact. (Immediately before the impact, from a stopped position the boxcar and train had commenced to back and had backed 3-4 feet before the impact, and continued westward for 18 feet more before coming to a stop.) There is also testimony by railroad witnesses that an empty boxcar is easily derailed by some object on the tracks (see Tr. 1206, 1281), such as a flying piece of debris from the automobile, pieces of which were scattered over the area immediately following the accident.
Although Highway 42 upon which the accident happened was a main approach to Lake Charles from the south, and although it connected the settled area of High Mount and the Lake Charles Air Base, with Lake Charles proper, and therefore was much used by city traffic, there is no evidence to indicate at the time of the accident any traffic other than the car wrecked herein was on the road. Further, at and surrounding the place of the accident, the record indicates Highway 42 did not pass through a settled area. It was immediately outside the city limits, which city limits in fact *896 passed through the crossing three feet east of the western highway boundary.
A speed of 50-60 mph is not so obviously hazardous or dangerous at the time and place of the accident, even though it was a dark night, as to impose upon a reasonably prudent passenger the duty of warning the driver and attempting to persuade him to go slower (even though in the event of accident such speed on the part of the driver might be found to constitute contributory negligence as to him). A similar contention was rejected as to contributory negligence of a passenger who permitted the driver to drive at 30-35 mph at nighttime, when visibility was obscured and ability to stop impaired by snow and sleet, White v. State Farm Mutual Automobile Insurance Company, 222 La. 994, 64 So.2d 245, 42 A.L.R.2d 338, reversing this court's contrary holding. The speed was there held to be not of such nature as to immediately apprise a guest that an accident was imminent, which observation applies to the present case, as the guest was not put on notice by such obviously excessive speed that the driver was driving too fast to observe or avoid striking all hazards of the road normally to be anticipated.
Again, defendant railroad does not seem to have borne its burden of proving on the part of the dead Sinegal such contributory negligence as would bar his father from recovering damages sustained by young Sinegal's death through the gross negligence of defendant railroad.
(3) Contributory negligence of Burwick Harris, driver of the car, killed in the wreck.
As to the driver of the death car, Burwick Harris, the cases above cited indicate that the driver of a car approaching a railroad crossing at night should either maintain sufficient lookout or have his car at sufficiently slow speed as not to "overdrive" his headlights so as to observe the railroad in time sufficient to avoid striking it.
The circumstances of the train's imperceptibility on the roadway ahead might justify application of the doctrine of Gainnie v. Cooperative Produce Company, 196 La. 417, 199 So. 377 (excusing in exceptional instances the failure of a motorist to observe an object in his path at nighttime) as to a driver proceeding with due care.
However, I am unable to say that the District Court incorrectly held that the driver either or both did not maintain sufficient lookout or was overdriving his headlights sufficiently so as negligently to contribute to the accident, proximately caused also by the hazardous crossing situation created by defendant's parking its train, difficult for oncoming traffic to observe, and so as to block the highway without warning of same.
In summary, it seems to me that recovery should be allowed on behalf of both passengers in the death car, since the defendant railroad did not sustain its burden of proving contributory negligence as to them which would bar recovery; but that the District Court's denial of recovery on behalf of the dead driver should be affirmed, in view of the greater duty upon him to avoid the accident which defendant may have successfully proved was breached by him.
For the above reasons, I respectfully dissent from the views of my brethren herein, believing that we should affirm the District Court's finding herein that defendant railroad was grossly negligent in the premises and plaintiff Muller free of contributory negligence barring his recovery.
NOTES
[1] This is not the allegation of plaintiffs' petitions in this lawsuit; this is the actual language of resolutions adopted by civic clubs just a few weeks before the present tragic accident.
[2] This communication of May 11, 1951, is what the majority opinion unintentionally but inaccurately labels as an "answer" to the protest resolutions of the Lake Charles civic organizations of September and October, 1951, just a few days and weeks before the accident.
[3] It was interesting to note in the testimony of Messrs. Peabody and Dimmick, taken by defendant by deposition, that an independent study by a midwestern railroad assigned the same relative rating of the value of the different types of railroad warning protections. (Tr. 397, 417.)
[4] See the Annotations, "Duty of Railroad Company to maintain Flagman at crossing" 16 A.L.R. 273 at 1284; 71 A.L.R. 1161 at 1174; and 24 A.L.R.2d 1161 at 1187, 1188, citing many cases to the effect that "Courts [such as those in Louisiana] which follow the rule that absence of a flagman may constitute negligence as to unsually dangerous crossings commonly regard the amount of travel on the crossing as an important consideration in determining the railroad company's duty," 71 A.L.R. 1161 at 1174.
[5] For example, in attempting to prove that this 21-year old man had the mentality of a bright 8-year old boy, rather than a subnormal child as testified to by expert testimony introduced by plaintiffs, defendant's expert included this interesting statement as to the results of some of the tests given Muller:

"Q. What are some of the others? A. These are the ones I used: First, he gives the correct change from a quarter paid for an article costing four cents. Second, he defines in term superior statements of use in the words, fork, table, chair, horsethree satisfactory out of that number. Third, he names the month, day and year. Allowing an error of three days either way he made an error of two days. Third, he arranges in order the weight of boxes of the same size two out of three trials. He states the difference between paper and clothing, butterfly and fly, wood and glass in two minutes. Two were satisfactory. He counts from one to twenty in twenty seconds with no more than one error. He names the days of the week in order in ten seconds. Four, he counts the value of six stamps. He didn't do too well on this test. Five, he repeats five numerals in order when pronounced once. These were the particular tests I used in that respect. The other part of the examination was detailed this morning." (TR-590-1) (Italics mine.)
[6] Cf. testimony of Dr. Barclay Funk, psychiatrist called by plaintiff, testifying under cross-examination:

"A. Mental functions are the ability to perceive and to interpret what is perceived, to integrate it, analyze it, translate it and to act, which may be speech or action.
"Q. And in which of those particulars did you find Sam Muller deteriorated? A. In his ability to comprehend, his judgment, his ability to recall, his memory." (Tr. 812.) (Italics ours.)
Also, testimony of Mr. Ray Miles, clinical psychologist, testifying on direct examination on behalf of plaintiff: "I would say if you asked Sam a question now and asked him the same question three months from now you would get entirely different answers. I feel he is irresponsible to testify or answer in the condition he is in now." (Tr. 758.)
Although Dr. C. P. May, psychiatrist testifying on behalf of defendant, testified that he found Muller suffering from no memory defects for the time immediately preceding the accident (Tr. 857), he also testified that amnesia was one of the frequent manifestations of severe head injuries and concussions with brain damage (Tr. 877.) That Muller suffered a head injury and a severe brain concussion is proven without question (although the permanent residual effects of said concussion present a substantial question).